[No. A101512. First Dist., Div. Three. Feb. 11, 2004.]

OXY RESOURCES CALIFORNIA LLC, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
CALPINE NATURAL GAS LP, Real Party in Interest.

[No. A101632. First Dist., Div. Three. Feb. 11, 2004.]

CALPINE NATURAL GAS LP, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
EOG RESOURCES, INC., et al., Real Parties in Interest.

Counsel

Mitchell Silberberg & Knupp, Elia Weinbach, Evan Goldstein and Douglas Bordewieck for Petitioner.

No appearance for Respondent.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, David S. MacCuish, Nana Nakano and Deborah Y. Jones for Real Party in Interest and for Petitioner Calpine Natural Gas LP.

Glynn & Finley, Clement L. Glynn and Andrew T. Mortl for Real Parties in Interest.

## Opinion

PARRILLI, J.—May parties negotiating a business transaction rely on a "joint defense agreement" as the basis for refusing to produce privileged documents exchanged long before they are actually sued by a third party? Ordinarily, a joint defense agreement protects privileged information shared by defendants after a lawsuit has been filed, including defense strategies. Here, the parties entered into a joint defense agreement before they finalized their negotiations, anticipating they might be sued. They now seek to protect from disclosure communications made during the course of the transaction that gives rise to the lawsuit they anticipated. We conclude in camera inspection of the material must occur before determining whether disclosure is compelled.

At issue are 202 documents reflecting communications between OXY Resources California LLC (OXY) and EOG Resources, Inc. (EOG). OXY and EOG entered into a complex transaction in which they exchanged interests in a number of oil and gas producing properties, including a property subject to a preferential purchase right held by Calpine Natural Gas LP (Calpine). Calpine sued OXY and EOG, contending it was denied the opportunity to exercise its contractual right of first refusal to purchase EOG's interest in the disputed property. Calpine moved to compel after OXY and EOG withheld documents reflecting communications that took place between OXY and EOG both before and after they finalized their transaction, but before Calpine filed its lawsuit. OXY opposed Calpine's motion to compel, asserting that all 202 withheld documents are protected from disclosure based on the attorney-client privilege or the work product doctrine, as well as on the basis of a joint defense agreement entered into by OXY and EOG before the close of the transaction.

The trial court granted Calpine's motion in part, ordering OXY to produce 172 postacquisition documents. The trial court denied the motion as to the

remaining 30 documents, which reflect preacquisition communications. In case No. A101512, OXY challenges the order granting in part the motion to compel, and in case No. A101632, Calpine challenges the order denying in part the motion to compel. We ordered the two writ petitions consolidated. We conclude that extraordinary relief is warranted and direct the trial court to conduct further proceedings as outlined below.

FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Calpine's Preferential Purchase Right*

Calpine seeks to enforce a preferential right to purchase EOG's former interest in the Elkhorn Slough, a valuable natural gas producing property in Solano County. As of late 1999, Calpine and EOG were parties to a series of agreements concerning their interests in the production of natural gas from the Elkhorn Slough, with EOG acting as operator of the joint business. Under the agreements, each party was obligated to give written notice of any proposed sale of its interests and provide the other party with an opportunity to purchase those interests on the same terms and conditions.

The preferential purchase right provides in relevant part as follows: "Should any party desire to sell all or any part of its interests under this agreement or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale . . . . The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell . . . . However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock."

### 2. *The 1999 Transaction Between EOG and OXY, and the "Joint Defense Agreement"*

On December 30, 1999, EOG transferred all its rights in the Elkhorn Slough to a newly created affiliate, EOG Resources California, LLC. The following day, on December 31, 1999, EOG and OXY USA, Inc., an affiliate of Occidental Petroleum Corporation (Occidental),[1] closed a tax-free

---

[1] According to OXY, the interests of OXY are indirectly owned by OXY USA, Inc., and Occidental indirectly owns OXY USA, Inc. Although OXY does not define what it means by "indirect ownership," the term is apparently a reference to ownership of the shares or

transaction in which EOG and OXY USA, Inc., swapped membership interests in limited liability companies that own oil and gas properties and interests in the states of Texas and California. In the transaction, OXY USA, Inc., acquired all of the membership interests in EOG Resources California, LLC., which it subsequently renamed OXY Resources California LLC (OXY).[2] Accordingly, at the conclusion of the transaction, OXY held the rights to the Elkhorn Slough previously owned by EOG. The Elkhorn Slough represents a small fraction of the value of all properties exchanged in the transaction.

Before finalizing their transaction, EOG entered into a "Joint Defense Agreement" with Occidental on November 15, 1999.[3] The Joint Defense Agreement recites that EOG and Occidental propose to exchange certain assets of EOG and OXY USA, Inc., and it states that Occidental and EOG "anticipate that the past and future ownership and operation of [assets exchanged by the parties] will present various legal and factual issues common to Occidental and [EOG], and the Parties, as anticipated potential defendants, acknowledge that they share a common interest in defending against Claims by Third Parties, and they may wish to make joint efforts in preparation against any defense of anticipated actions or proceedings." The parties expressed their "intention and understanding that (a) the fact that particular communications have been made between the Parties to this Agreement, (b) the information communicated, and (c) any documents ex-changed as part of such communications, shall remain privileged or otherwise exempt from discovery by any Third Party, by reason of each Party's attorney-client communication privilege, each Party's and their counsel's work product doctrine immunity, the joint defense doctrine, the environmental audit privilege, the self-critical analysis privilege and any other privilege or exemption recognized under applicable law. No sharing of information under this [Joint Defense Agreement] between the Parties and/or their Representatives shall be deemed a waiver of any otherwise applicable privilege or other exemption from discovery or disclosure."

---

membership interests in the business entities as opposed to direct ownership of the assets held by the entities.

[2] For the sake of convenience in this opinion, OXY Resources California, LLC, and its affiliated entities, Occidental and OXY USA, Inc., are sometimes referred to collectively as OXY.

[3] OXY sought to file the Joint Defense Agreement under seal with this court, contending it is a confidential communication that is privileged and protected from disclosure. Based upon our finding that the Joint Defense Agreement contains no attorney work product or other confidential information that might justify sealing, we denied the motion. Pursuant to rule 12.5(e)(7) of the California Rules of Court, OXY then directed the clerk to file the Joint Defense Agreement, and we have considered it in reaching our decision.

### 3. *Calpine's Response to the 1999 Transaction Between EOG and OXY*

EOG and OXY announced their transaction in a January 3, 2000 press release. In response to the press release, Calpine sent a letter to EOG on January 11, 2000, advising EOG of its preferential right to purchase EOG's interest in the Elkhorn Slough. In the letter, Calpine informed EOG that "[w]e have recently read of [EOG's] exchange of certain assets in the Sacramento Basin to [OXY]. In the event that the exchange includes the Elkhorn Slough area in Solano County, California, this is to advise that a preferential right to purchase exists as to that property. . . . [¶] It was unclear in your press release what stage of the transaction you were involved in, so our notice might be a bit premature. However, we respectfully request that notice under the above referenced letter agreement be delivered to [Calpine's] office in Houston to my attention." Calpine sent EOG a follow-up letter on February 4, 2000, again advising EOG of its preferential purchase right. According to Calpine, EOG did not respond to Calpine's inquiries.

EOG eventually informed Calpine that, as a consequence of the manner in which the transaction was structured, the preferential purchase right did not apply.[4] Calpine formally notified EOG on November 7, 2000, that Calpine would enforce its preferential purchase right.

Calpine filed this action against EOG and OXY on May 22, 2001.[5] Calpine thereafter filed a first amended complaint on April 26, 2002, alleging causes of action against EOG and OXY for declaratory relief, specific performance, and an accounting. In addition, Calpine alleged causes of action against EOG for breach of contract and breach of the covenant of good faith and fair dealing, and against OXY for unjust enrichment and intentional interference with a contractual relationship.[6] The causes of action in the first amended complaint are all premised on Calpine's contractual preferential right to purchase EOG's interests in the Elkhorn Slough. Calpine alleges that OXY was aware of the preferential purchase right affecting the Elkhorn Slough and that OXY and EOG developed and implemented a scheme to avoid the exercise of the preferential purchase rights. Calpine also contends it would have purchased EOG's interests in the Elkhorn Slough if it had been notified of the pending sale to OXY.

---

[4] In the action below, OXY asserts that Texas law governs the transaction. Relying on *Tenneco Inc. v. Enterprise Products Co.* (Tex. 1996) 925 S.W.2d 640, OXY argues that conveyance of a 100 percent equity interest in a company, as opposed to a sale of assets held by the company, does not trigger a contractual preferential right of a third party to acquire the company's interest in certain property.

[5] Calpine did not name OXY USA, Inc., or Occidental as defendants.

[6] The trial court sustained demurrers to causes of action for breach of fiduciary duties and intentional and negligent interference with prospective economic advantage.

### 4. *Calpine's Motion to Compel*

In response to document requests served by Calpine, OXY and EOG withheld certain documents and provided Calpine with privilege logs identifying the withheld documents. Among the documents withheld were 204 documents exchanged between OXY and EOG at various times before and after the close of the transaction on December 31, 1999.

As reflected in EOG's privilege log, the privilege claimed as to the withheld documents exchanged between OXY and EOG is either a combination of joint defense and attorney work product, or a combination of joint defense, attorney work product, and attorney-client privilege. EOG's description of each withheld document on its privilege log gives some indication of the content of the communication. For example, EOG described one document as "1-page e-mail, re: Attached draft consent request letter for EOG properties."

OXY's privilege log is less revealing than EOG's. Although the document description in OXY's privilege log identifies the document's senders and recipients as well as the type of communication (e.g., letter, e-mail, or facsimile cover sheet), the description gives no indication of the purpose or content of the communication. The privilege claimed as to the withheld documents exchanged between OXY and EOG is either just "JDA," referring to the Joint Defense Agreement, or the Joint Defense Agreement combined with the attorney-client privilege and/or the work product doctrine. Roughly 70 of the documents on OXY's privilege log were withheld solely on the ground of the Joint Defense Agreement, without reference to any underlying privilege, privacy claim, or claim of work product protection.

Calpine ultimately filed a motion to compel the production of the 204 withheld documents that had been exchanged between EOG and OXY. Two of the disputed documents were voluntarily produced to Calpine by OXY. Of the remaining 202 documents, 30 are dated from November 22, 1999, through December 29, 1999, two days before the close of the transaction. With three exceptions, the remaining documents are dated January 5, 2000, through June 20, 2000.[7] Therefore, 30 of the documents may be characterized as preacquisition communications, while the remaining 172 documents are postacquisition communications between OXY and EOG.[8] All 202 disputed documents predate the filing of Calpine's complaint in May 2001.

---

[7] The three documents falling outside this date range are e-mails sent in December 2000.

[8] Calpine claims the contested number of documents rose from 204 to 208 based on a supplemental privilege log produced by OXY during the pendency of Calpine's motion to compel. According to Calpine, the trial court has not ruled on four of the documents first identified in OXY's supplemental privilege log.

In its motion to compel, Calpine contended that California does not recognize a "joint defense privilege." Calpine also asserted that while OXY and EOG now find themselves as defendants in this action, they cannot retroactively invoke their "joint defendant" status to prevent the disclosure of communications made long before this action was filed. Furthermore, according to Calpine, OXY and EOG waived any applicable privileges by disclosing the communications to an adverse party on the opposite side of a business transaction.

OXY opposed the motion to compel, contending that California courts recognize a "common interest" doctrine that is functionally indistinguishable from the "joint defense privilege" recognized by courts in other jurisdictions. According to OXY, the communications sought by Calpine relate to matters in which OXY and EOG shared common interests in connection with their transaction.

In support of its common interest claim, OXY provided declarations from Linda Peterson, an in-house attorney employed by Occidental, and Todd Stevens, Occidental's director of mergers and acquisitions. Although Peterson and Stevens declare in general terms that OXY shared common interests with EOG in connection with the transaction, they make little effort to identify the common interest underlying each of the withheld documents, other than to aver that all of the 202 disputed communications are "limited to subjects dealing with and involving the Transaction."

In her declaration, Peterson refers to the Joint Defense Agreement between EOG and OXY and generally describes the parties' agreement to work together on matters of common interest in connection with the transaction without waiving privileges applicable to confidential materials that might be exchanged by the parties. Peterson also states that, as counsel for OXY, she believed in good faith after approximately January 11, 2000 (the date of Calpine's letter inquiry to EOG about its preferential purchase right) that Calpine might assert the kinds of claims it has now alleged in this lawsuit. Peterson also indicates that she had reviewed the list of documents sought by Calpine and had concluded that "all of the documents identified on OXY's privilege log, and now sought by Calpine's motion, were either attorney-client privileged documents, documents protected by the attorney work-product doctrine, or documents protected by the Joint Defense ("Common Interest") privilege generated by counsel or at the request of counsel in furtherance of the parties' mutual interest in completing the Transaction." In his declaration, Stevens likewise indicates that he had reviewed the documents sought by Calpine and states that "[a]t no time did I, nor to my knowledge did anyone, intend that any of the documents be disclosed, nor to my knowledge were they disclosed, other than to representatives of OXY or

its attorneys to whom disclosure was made in the furtherance of the rendition of professional legal services for OXY, or those reasonably necessary for the transmission of the documents, or to those persons who were employed by EOG, in accordance with and pursuant to the Joint Defense Agreement."

EOG did not oppose Calpine's motion to compel. Instead, EOG filed a response stating that "[it] withheld documents and asserted [the joint defense or common interest] privilege at the request of [OXY], who wished to assert the privilege. Thus, EOG looks to the Court for guidance regarding the discoverability of the withheld documents and does not otherwise take a position regarding the application of the privilege or Calpine's motion to compel."

## 5. *The Trial Court's Ruling*

In an order dated December 23, 2002, the trial court granted Calpine's motion to compel as to the 172 postacquisition documents and denied it as to the 30 preacquisition documents.[9] The trial court concluded that the preacquisition documents are privileged, relying on *STI Outdoor v. Superior Court* (2001) 91 Cal.App.4th 334 [109 Cal.Rptr.2d 865] (*STI*). According to the trial court, "[d]ocuments exchanged by parties who have already committed in writing to negotiate a more detailed formal agreement are protected under the 'common interest' theory, as reasonably necessary to further the interests of both parties in finalizing negotiations." The trial court noted that all 30 of the preacquisition documents are dated between the time OXY and EOG signed a letter of intent and the time they finalized the negotiations and entered into formal contracts.

As for the 172 postacquisition documents the court ordered OXY to produce, the trial court "considered whether mutual disclosures were reasonably necessary, and determined that they were not." The trial court noted the communications were not necessary for the finalization of negotiations and observed there is no "joint defense" privilege, citing *Raytheon Co. v. Superior Court* (1989) 208 Cal.App.3d 683 [256 Cal.Rptr. 425] (*Raytheon*). Contrasting the facts in the case before us to those in *Raytheon,* the trial court concluded: "This case does not involve a complicated strict liability toxic

---

[9] At oral argument on the motion, the trial court tentatively granted the motion to compel as to *all* 202 documents, reasoning, "[t]here is no joint defense privilege applicable to parties involved in a transaction. Each side retains its own attorneys to provide legal advice and cannot reasonably expect or rely upon counsel retained by the other side to provide reliable legal advice or keep confidences, even if a written agreement claims to agree to such an agreement. Documents exchanged between the attorneys on both sides of the transaction therefore constitutes transmittal to a person inconsistent with an intention to keep confidential those documents, thus waiving the attorney-client or work product privileges that might otherwise apply."

clean-up situation, where it might be reasonably necessary for potentially responsible parties to exchange information for purposes of assessing potential allocation of liability."

The trial court also clarified its order by directing OXY to produce only those portions of postacquisition documents that were actually shared with EOG. This clarification resulted from OXY's informing the court that some of the disputed documents were "e-mail threads" consisting of a string of separate e-mail messages, some of which were not shared with EOG. The court directed OXY to prepare an amended privilege log identifying the unshared portions with sufficient particularity, including identifying the affiliation of the senders and recipients. Although the trial court ordered OXY to prepare a more detailed privilege log, the order does not contemplate further trial court action to review and rule on OXY's privilege claims. Thus, the trial court's ruling is based on information contained in OXY's original privilege logs, not the amended privilege logs required by the order.[10]

OXY filed a petition in this court seeking relief from the trial court's order directing production of the 172 postacquisition documents. We granted a stay of the trial court's order directing production of the postacquisition documents. Calpine filed a petition seeking relief from the trial court's order denying Calpine's motion to compel production of the 30 preacquisition documents. On the court's own motion, we ordered the two petitions consolidated for all purposes, and we issued an order to show cause.

DISCUSSION

### 1. *Propriety of Writ Review*

Writ review of discovery rulings is generally limited to "situations where (1) the issues presented are of first impression and of general importance to the trial courts and to the profession [citation], (2) the order denying discovery prevents a party from having a fair opportunity to litigate his or her case [citations], or (3) the ruling compelling discovery would violate a privilege [citations]." (*Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1061 [95 Cal.Rptr.2d 864].) Writ review is appropriate here because the trial court's order compelling the production of 172 documents violates a privilege allegedly held by OXY. "Interlocutory review by writ is the only adequate remedy where a court orders production of documents which may be subject to a privilege, 'since once privileged matter has been disclosed

---

[10] OXY submitted a copy of its revised privilege log to this court with its writ petition. Because the trial court did not consider or rely upon the revised privilege log in ruling on Calpine's motion to compel, the revised privilege log is not properly a part of the record underlying the trial court's ruling, and we have not considered it.

there is no way to undo the harm which consists in the very disclosure.' [Citations.] The attorney-client privilege 'deserves a particularly high degree of protection in this regard since it is a legislatively created privilege protecting important public policy interests, particularly the confidential relationship of attorney and client and their freedom to discuss matters in confidence.' [Citations.]" (*Korea Data Systems Co. v. Superior Court* (1997) 51 Cal.App.4th 1513, 1516 [59 Cal.Rptr.2d 925].)

Although OXY urges interlocutory review of the order compelling the production of the postacquisition documents, OXY contends there is no compelling reason to entertain writ review of that portion of the trial court's order denying the motion to compel as to the 30 preacquisition documents. We disagree. Ordinarily, we would not be inclined to grant writ review of an order denying a motion to compel, but our consideration of the issues in OXY's petition necessarily involves a consideration of the issues in Calpine's petition. Considering the petitions together now conserves judicial resources and ensures a consistent and complete ruling on privilege issues. Moreover, the issues presented are of general importance to the trial courts and to the profession. There is little California case law examining the so-called "common interest" or "joint defense" doctrine as applied to parties to a business transaction. And, we are unaware of any California cases discussing the consequences of a "joint defense agreement" entered into by parties to a transaction, or the propriety of an in camera review of documents allegedly protected by the attorney-client privilege but disclosed to parties outside the attorney-client relationship pursuant to a joint defense agreement.

2. *Standard of Review*

Appellate review of discovery rulings is governed by the abuse of discretion standard. "Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. [Citation.]" (*Johnson v. Superior Court, supra,* 80 Cal.App.4th at p. 1061.) "The trial court's determination will be set aside only when it has been demonstrated that there was 'no legal justification' for the order granting or denying the discovery in question." (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612 [56 Cal.Rptr.2d 341], citing *Carlson v. Superior Court* (1961) 56 Cal.2d 431, 438 [15 Cal.Rptr. 132, 364 P.2d 308].)

3. *The "Common Interest" or "Joint Defense" Doctrine Under California Law*

OXY seeks to protect the documents at issue from disclosure by relying on the principle that parties who possess common legal interests may share

privileged information without losing the protection afforded by the privilege. This principle operates as an exception to the general rule that a privilege is waived upon voluntary disclosure of the privileged information to a third party, and has been variously referred to as the "joint defense" doctrine, the "common interest" doctrine, and the "pooled information" doctrine, among other terms. (See *In re Indiantown Realty Partners* (Bankr. S.D.Fla. 2001) 270 B.R. 532, 539 & fn. 1; see also *United States v. Schwimmer* (2d Cir. 1989) 892 F.2d 237, 243 [referring to "joint defense privilege" and "common interest rule"].)

Over 120 years ago, the Virginia Supreme Court was the first court to recognize a "joint defense privilege" by protecting from disclosure communications among multiple defense counsel and defendants who faced conspiracy charges. (See Watson, *Ethical Implications of Joint Defense or Common Interest Agreements* (1998) 12-SUM Antitrust 59.) "Over the years, the concept of joint defense has expanded to include plaintiffs, parties in civil actions, parties who oppose one another in a case but are able to join forces on a particular issue of common interest, and parties who are not yet engaged in litigation but who coordinate efforts to avoid litigation even before litigation is foreseeable. Therefore, the more inclusive terminology of 'common interest' more accurately describes what was originally purely a joint defense concept." (*Ibid.*, fns. omitted.)

There is little California case law discussing the "common interest" or "joint defense" doctrine. Indeed, most of the case law addressing this principle is federal in origin. (See Kopta, *Applying the Attorney-Client and Work Product Privileges to Allied Party Exchange of Information in California* (1988) 36 UCLA L.Rev. 151, 155.) Because the Federal Rules of Evidence provide that principles of common law govern rules of privilege, federal courts have the flexibility to develop rules of privilege on a case-by-case basis. (*Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 99 [185 Cal.Rptr. 97].) Thus, for example, the Ninth Circuit Court of Appeals has recognized a "joint defense privilege" as an "extension of the attorney-client privilege" since at least 1964. (*United States v. Henke* (9th Cir. 2000) 222 F.3d 633, 637.)

Unlike the federal courts, "[t]he courts of this state . . . are not free to create new privileges as a matter of judicial policy and must apply only those which have been created by statute. [Citations.]" (*Dickerson v. Superior Court, supra,* 135 Cal.App.3d at p. 99; see Evid. Code, § 911.)[11] Indeed, "[o]ur deference to the Legislature is particularly necessary when we are called upon

---

[11] Evidence Code section 911 provides in relevant part that "[e]xcept as otherwise provided by statute[,] . . . [n]o person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing."

"to interpret the attorney-client privilege, because the Legislature has determined that evidentiary privileges shall be available only as defined by statute. [Citation.] Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], nor may courts imply unwritten exceptions to existing statutory privileges. [Citations.]" (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496].) The area of privilege " 'is one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme.' [Citation.]" (*Dickerson v. Superior Court, supra,* 135 Cal.App.3d at p. 99.)

The "joint defense privilege" and the "common interest privilege" have not been recognized by statute in California.[12] (See *Raytheon, supra,* 208 Cal.App.3d at p. 689 ["there is no 'joint defense privilege' as such in California . . . ."]; *First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co.* (N.D.Cal. 1995) 163 F.R.D. 574, 581.) For this reason, we will refer to the joint defense or common interest *doctrine,* rather than the joint defense or common interest privilege, to avoid suggesting that communications between parties with common interests are protected from disclosure by virtue of a privilege separate from the attorney-client privilege, the work product doctrine, or any other statutorily recognized evidentiary privilege.

■ Both OXY and Calpine describe the joint defense or common interest doctrine as an "extension" of the attorney-client privilege. We reject this characterization to the extent it suggests there is an expanded attorney-client relationship encompassing all parties and counsel who share a common interest. (See, e.g., *United States v. Henke, supra,* 222 F.3d at p. 637 [construing joint defense privilege as giving rise to attorney-client relationship between one party and counsel representing another party who shares common interest].) Rather, the common interest doctrine is more appropriately characterized under California law as a nonwaiver doctrine, analyzed under standard waiver principles applicable to the attorney-client privilege and the work product doctrine.[13] (See *Raytheon, supra,* 208 Cal.App.3d at pp. 687–689.)

---

[12] We note there is a statutorily recognized "joint client" or "common interest" exception to the attorney-client privilege, which applies only where " 'two or more clients have retained or consulted a lawyer upon a matter of common interest,' in which event neither may claim the privilege in an action by one against the other. [Citation.]" (*Rockwell International Corp. v. Superior Court* (1994) 26 Cal.App.4th 1255, 1267 [32 Cal.Rptr.2d 153]; see Evid. Code, § 962.) OXY acknowledges that the "joint client" principle has no application to this set of facts, because OXY and EOG had separate counsel representing them at all times. Furthermore, although California does recognize a so-called "common interest privilege," it is not an evidentiary privilege. Rather, this common interest privilege is codified in Civil Code section 47, subdivision (c), which provides that certain communications between parties who have shared interests are subject to a qualified privilege and therefore are not actionable as defamation. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914 [120 Cal.Rptr.2d 576].)

[13] "Rather than use these doctrines as a basis for effecting a general expansion of the attorney-client privilege, California courts appear to resolve disputes that arguably implicate

■ Therefore, a party seeking to rely on the common interest doctrine does not satisfy its burden to justify a claim of privilege simply by demonstrating that a confidential communication took place between parties who purportedly share a common interest. Rather, the party seeking to invoke the doctrine must first establish that the communicated information would otherwise be protected from disclosure by a claim of privilege. For example, the content of the communication may comprise information shared in confidence by a client with his or her attorney, a legal opinion formed and advice given by the lawyer in the course of the attorney-client relationship, or a writing reflecting an attorney's impressions, conclusions, or theories. (See Evid. Code, § 952; Code Civ. Proc., § 2018, subd. (c).) The next step in the analysis is to determine whether disclosing the information to a party outside the attorney-client relationship waived any applicable privileges.

Accordingly, we turn to the controlling law regarding waiver of privilege by disclosure. The statute regarding waiver of privileges, Evidence Code section 912, provides: "A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege) . . . , when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted, is not a waiver of the privilege."[14] (Evid. Code, § 912, subd. (d).) Thus, for example, the "privilege extends to communications which are intended to be confidential, if they are made to attorneys, to family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant." (*Insurance Co. of North America v. Superior Court* (1980) 108 Cal.App.3d 758, 767 [166 Cal.Rptr. 880], quoting *Cooke v. Superior Court* (1978) 83 Cal.App.3d 582, 588 [147 Cal.Rptr. 915].) "While involvement of an *unnecessary* third person in attorney-client communications destroys confidentiality, involvement of third persons to whom disclosure is reasonably necessary to further the purpose of the legal consultation preserves confidentiality of communication." (*Insurance Co. of North America v. Superior Court, supra,* 108 Cal.App.3d at p. 765.)

---

these notions by relying either generally on 'waiver' analysis or specifically on interpretation of one concept that is common to both sections 912 and 952 of the California Evidence Code. [Citations.]" (*First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co., supra,* 163 F.R.D. at p. 581.)

[14] Section 952 of the Evidence Code, which defines a "confidential communication" between a client and lawyer, similarly acknowledges that information transmitted between a client and lawyer retains its privileged character if transmitted in confidence "to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted . . . ."

"There is no statutory provision governing waiver of work product protection. [Citation.]" (*Raytheon, supra,* 208 Cal.App.3d at p. 688; cf. Code Civ. Proc., § 2018.) However, California courts have recognized that the waiver doctrine is applicable to the work product rule as well as the attorney-client privilege. (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 214 [91 Cal.Rptr.2d 716, 990 P.2d 591].) The work product protection may be waived "by the attorney's disclosure or consent to disclosure to a person, other than the client, who has no interest in maintaining the confidentiality . . . of a significant part of the work product." (2 Jefferson, Cal. Evidence Benchbook (3d ed. 2003) § 41.6; see also *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1261 [245 Cal.Rptr. 682]; *Raytheon, supra,* 208 Cal.App.3d at p. 689.) Thus, work product protection "is not waived except by a disclosure wholly inconsistent with the purpose of the privilege, which is to safeguard the attorney's work product and trial preparation. [Citations.]" (*Raytheon, supra,* 208 Cal.App.3d at p. 689.)

█ Applying these waiver principles in the context of communications among parties with common interests, it is essential that participants in an exchange have a reasonable expectation that information disclosed will remain confidential. If a disclosing party does not have a reasonable expectation that a third party will preserve the confidentiality of the information, then any applicable privileges are waived. An expectation of confidentiality, however, is not enough to avoid waiver. In addition, disclosure of the information must be reasonably necessary for the accomplishment of the purpose for which the lawyer was consulted. (Evid. Code, § 912, subd. (d).) Thus, "[f]or the common interest doctrine to attach, most courts seem to insist that the two parties have in common an interest in securing legal advice related to the same matter—and that the communications be made to advance their shared interest in securing legal advice on that common matter." (*First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co., supra,* 163 F.R.D. at p. 581; see also *Raytheon, supra,* 208 Cal.App.3d at pp. 688–689.) With these principles in mind, we examine the litigants' specific claims.

4. *The Joint Defense Agreement*

OXY and Calpine dispute the significance of the Joint Defense Agreement. Calpine contends the Joint Defense Agreement "was nothing more than a conspiracy to shield their communications . . . [and that] such agreements to suppress evidence are void as a matter of public policy." OXY asserts that the agreement "is evidence of the fact that the disclosures were made in furtherance of the client's common interests, and wholly consistent with the maintenance of the confidentiality of the attorney's work product."

To support its assertion the Joint Defense Agreement is void as a matter of public policy, Calpine relies on *Williamson v. Superior Court* (1978) 21

Cal.3d 829 [148 Cal.Rptr. 39, 582 P.2d 126] and *Smith v. Superior Court* (1996) 41 Cal.App.4th 1014 [49 Cal.Rptr.2d 20]. "In *Williamson,* one defendant showed a codefendant an expert opinion highly critical of the latter, and [the] codefendant agreed to indemnify the first defendant in return for suppression of the report. *Williamson* ordered disclosure, holding it was against public policy for one defendant to agree with an adversarial codefendant to suppress the results of an investigation." (*Raytheon, supra,* 208 Cal.App.3d at p. 686.)

In *Smith,* a car manufacturer and a former employee with knowledge of highly relevant nonprivileged information concerning product liability claims entered into an agreement settling a wrongful termination lawsuit by the former employee. (*Smith v. Superior Court, supra,* 41 Cal.App.4th at pp. 1018–1019.) As part of their agreement, the parties stipulated the former employee would not testify in any action against the car manufacturer without the car manufacturer's consent. (*Id.* at p. 1019.) A Michigan court then granted a permanent injunction adopting the agreement of the parties. (*Ibid.*) The court in *Smith* held the injunction was not enforceable in California, noting that "[w]hile we recognize the attorney-client and work-product privileges, '[a]greements to suppress evidence have long been held void as against public policy, both in California and in most common law jurisdictions.' " (*Id.* at p. 1025, quoting *Williamson v. Superior Court, supra,* 21 Cal.3d at p. 836–837.)

Contrary to Calpine's assertion, the decisions in *Williamson* and *Smith* do not dictate a conclusion the Joint Defense Agreement is void as a matter of public policy. The cases turn on the narrow public policy ground that a bargain to suppress nonprivileged testimony or documents is disfavored for obvious reasons. Neither decision reaches the issue of waiver by disclosure to an adverse party.

■ Unlike the agreements in *Smith* and *Williamson,* the Joint Defense Agreement does not suppress nonprivileged information that would otherwise be discoverable. Instead, the Joint Defense Agreement applies only to those documents and communications already protected from disclosure by the attorney-client privilege and the attorney work product doctrine, and it simply confirms the parties' agreement not to waive any applicable privileges by virtue of sharing privileged information on issues of common interest. The Joint Defense Agreement provides evidence of a reasonable expectation of confidentiality required to invoke the common interest doctrine and avoid waiver by disclosure. A common interest agreement, such as the Joint Defense Agreement, strengthens the case against waiver, but such an agreement is neither a requirement nor a guarantee.

We are mindful, however, that the Joint Defense Agreement covers communications that may be highly relevant to the issues at the center of this dispute, including Calpine's contention that OXY and EOG conspired to deprive Calpine of its preferential purchase right. Typically, a joint defense agreement protects information shared by defendants after a lawsuit has been filed, and it serves the purpose of protecting from disclosure the joint defendants' trial strategies and preparation. Here, by contrast, the Joint Defense Agreement also purports to protect communications made during the course of the transaction that gives rise to this lawsuit. According to Calpine, this type of agreement "amounts to a premeditated and intentional plan to shield conspiratorial communications involving a transaction that directly and adversely affected Calpine's contractual rights . . . ."[15]

We agree there is a potential for abuse when parties rely on common interest agreements to protect prelawsuit communications that may be highly relevant to issues presented in a lawsuit. This concern, however, does not render the Joint Defense Agreement void, because the agreement cannot be relied upon to shield nonprivileged communications and contract negotiations from disclosure.

While the Joint Defense Agreement may not be void as against public policy, it cannot serve as the sole ground for withholding documents from disclosure. In this connection, Calpine contends OXY's asserted claim of privilege as to 13 of the preacquisition documents is based solely on the Joint Defense Agreement, without reference to any underlying privilege. The same is true with respect to 54 of the 172 postacquisition documents that the trial court ordered produced. OXY asserts that documents withheld solely on the basis of the Joint Defense Agreement are privileged because the common interest doctrine "is bottomed on the attorney-client privilege." We agree that the common interest doctrine cannot be invoked unless there is an underlying claim of privilege. But OXY has not met its burden to establish a claim of privilege as to the documents withheld solely on the basis of the Joint Defense Agreement. As reflected on OXY's privilege log, the sole basis for withholding the documents is the Joint Defense Agreement. In her declaration submitted to the trial court, Linda Peterson, an in-house lawyer at Occidental, states that withheld documents sought by Calpine are "*either* attorney-client privileged documents, documents protected by the attorney work-product doctrine, *or* documents protected by the Joint Defense ('Common Interest')

---

[15] If otherwise adverse parties with separate counsel are engaged in a common enterprise to commit a crime or a fraud, they cannot rely on the common interest doctrine to shield their communications, even on matters of common interest, because there is no underlying privilege if the services of a lawyer are sought to aid someone in planning or committing a crime or fraud. (See Evid. Code, § 956.) Calpine does not rely on the crime/fraud exception as the basis for seeking disclosure of the disputed documents.

privilege generated by counsel or at the request of counsel in furtherance of the parties' mutual interest in completing the Transaction." (Italics added.)

 The privilege log and OXY's declarations do not establish a privilege claim as to documents withheld solely on the basis of the Joint Defense Agreement. In business transactions, counsel routinely generate or request generation of documents to be exchanged by the parties. This action furthers a mutual interest in completing the transaction. These facts alone, however, do not establish a claim of privilege as to the exchanged documents. The Joint Defense Agreement merely evidences an expectation of confidentiality necessary to avoid waiver by disclosure to someone outside the attorney-client relationship; it does not protect documents from disclosure, unless they contain or reflect attorney-client communications or attorney work product. Accordingly, we conclude the trial court abused its discretion in denying Calpine's motion to compel as to the 13 preacquisition documents withheld solely on the basis of the Joint Defense Agreement.

### 5. Necessity of In Camera Review

OXY argues it has presented a prima facie claim of privilege, which Calpine has failed to refute because it has offered no evidence contradicting the Peterson and Stevens declarations. OXY relies heavily on Evidence Code section 917, which provides: "Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of the privilege has the burden of proof to establish that the communication was not confidential." The party asserting the privilege need only present facts which "support a prima facie claim of privilege." (*Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 123 [68 Cal.Rptr.2d 844].) " 'The party opposing the privilege must bear the burden of showing that the claimed privilege does not apply or that an exception exists or that there has been an express or implied waiver.' " (*Id.* at p. 124, quoting *Lipton v. Superior Court, supra,* 48 Cal.App.4th at p. 1619.)

OXY's reliance on Evidence Code section 917 is misplaced. Calpine has submitted documents indicating that OXY and EOG had adversarial interests with respect to at least some preferential purchase rights affected by their transaction. For example, in a May 26, 2000 letter from OXY's counsel to EOG's counsel, OXY charged that EOG failed to obtain consents from certain preferential rights holders (other than Calpine) and demanded $19.8 million for the value of the affected property. This adversarial position on the preferential purchase right issue at least raises the possibility that OXY and EOG did not have an expectation that communications concerning preferential purchase rights would be maintained in confidence.

Even OXY acknowledges the interests of EOG and OXY in the transaction were "adversarial, common, and at times, a blend of the two." Yet, OXY apparently expects the court to rely entirely on the conclusory Peterson and Stevens declarations, which simply state in general terms that EOG and OXY had a common interest in finalizing their transaction and in responding to Calpine's inquiries about the Elkhorn Slough. Neither the privilege log nor the declarations reveal the content of any of the communications, so it would be impossible for Calpine to offer evidence refuting OXY's claims that all of the withheld communication involve matters of common interest. Indeed, without more information about the disputed documents, Calpine cannot demonstrate that each communication between OXY and EOG was not reasonably necessary to accomplish the purpose for which a lawyer was consulted.

As a practical matter, it is impossible to know whether any of the disclosures of purportedly privileged information between OXY and EOG were reasonably necessary to accomplish the purpose for which a lawyer was consulted without knowing in at least a general sense the communication's content. OXY correctly notes that a privilege claimant is not obliged to reveal the subject matter of a communication to establish a claim of privilege. (See Assem. Com. on Judiciary com., 23B pt.3 West's Ann. Evid. Code (1995 ed.) foll. § 917, p. 180.) The issue here, however, is not whether the documents contain privileged information. Rather, it is whether any privileges were waived because of disclosure to a third party. Moreover, we do not suggest that OXY must amend its privilege log to describe the content of each document. Instead, an in camera review of the documents would permit the court to determine whether the disclosures were reasonably necessary to accomplish the lawyer's role in the consultation. OXY argues that the inviolability of the attorney-client privilege prohibits even an in camera review of the communications at issue here. We disagree.

Subject to certain exceptions not relevant here, subdivision (a) of Evidence Code section 915 provides that a court may not require disclosure of information claimed to be privileged in order to rule on a claim of privilege.[16] In camera review of privileged documents is generally prohibited because "the privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case." (*Gordon v. Superior Court* (1997) 55 Cal.App.4th 1546, 1557 [65 Cal.Rptr.2d 53]; see also *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 466 [107 Cal.Rptr.2d 456].)

---

[16] Subdivision (a) of section 915 also prohibits a court from conducting an in camera review of an attorney's work product as defined in subdivision (c) of Code of Civil Procedure section 2018, which encompasses "[a]ny writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories."

The rule against in camera review, however, is not absolute. (See *Cornish v. Superior Court* (1989) 209 Cal.App.3d 467, 480 [257 Cal.Rptr. 383].) "The rule is based on the notion that when there is a claim of attorney client privilege, for example, it is neither customary nor necessary to review the contents of the communication in order to determine whether the privilege applies as the court's factual determination does not involve the nature of the communications or the effect of disclosure but rather the existence of the relationship at the time the communication was made, the intent of the client and whether the communication emanates from the client. [Citation.]" (*Ibid.*) "[C]ourts have recognized, if necessary to determine *whether an exception to the privilege applies*, the court may conduct an in camera hearing notwithstanding section 915. [Citation.]" (*Ibid.,* italics added.) Generally, in camera hearings should be limited to a determination whether there is an exception to, or waiver of, the privilege, and "whether the exception or waiver depends on the content of the communication. [Citation.]" (*People v. Manago* (1990) 220 Cal.App.3d 982, 990, fn. 4 [269 Cal.Rptr. 819].) "[W]here an exception to a privilege depends upon the content of a communication, the court may require disclosure *in camera* in making its ruling." (*Mavroudis v. Superior Court* (1980) 102 Cal.App.3d 594, 606 [162 Cal.Rptr. 724].)

■ Although the protection of the attorney-client privilege is absolute, the protection afforded by the common interest doctrine is qualified, because it depends on the content of the communication. Even OXY concedes the qualified nature of the common interest doctrine by observing there is "no absolute brightline [*sic*] test which distinguishes between the parties [*sic*] 'adversarial' interests and their 'common' interests. At the ends of the spectrum, such distinctions may be more easily made. For example, when the parties were negotiating over the 'value' of a particular property, their interests may have been adversarial; when the parties were discussing environmental issues that might affect the properties that were being transferred, their interests were 'common.'"

■ In camera review is appropriate here. The trial court's analysis of OXY's reliance on the common interest doctrine depends on the nature of the communications and the effect of disclosure. In camera review will permit a determination of whether disclosure to a third party was reasonably necessary to accomplish the lawyer's purpose in the consultation. The purpose of in camera review here is not to determine whether the underlying information is privileged or relevant.

■ Anticipating in camera review, OXY contends "[it] cannot reasonably be expected to furnish the details motivating *each* disclosure, as literally hundreds of communications are involved . . . ." While it is true that nearly 200 documents are at issue, the task's magnitude should not relieve a party of

its obligation to substantiate a claim based on the common interest doctrine. Moreover, in most cases the common interest should be evident on the face of the document, without any need for detail on the motivation behind the disclosure. To the extent this task proves overly time-consuming and burdensome for the trial court, it can appoint a discovery referee for in camera review. (See Code Civ. Proc., § 639, subd. (a)(5).)

## 6. *Preacquisition Communications*

The Court of Appeal in *STI, supra*, 91 Cal.App.4th 334, considered whether parties to a business transaction waived applicable privileges by sharing otherwise privileged information. In *STI*, the Los Angeles County Metropolitan Transportation Authority (MTA) solicited bids for the installation of automated public toilets. (*STI, supra*, 91 Cal.App.4th at pp. 336–337.) In exchange for the construction, the MTA offered the successful bidder the use of certain advertising sites along property owned by the MTA. (*Id.* at p. 337.) Eller Media Company (Eller) chose not to submit a bid after concluding the advertising sites were not in desirable locations. (*Ibid.*) STI Outdoor LLC (STI) was the only party that submitted a bid. (*Ibid.*) After STI's bid was accepted, the parties began negotiating the terms of a license agreement, which was entered into almost two years after the close of bidding. (*Ibid.*)

Sometime after the MTA and STI executed the license agreement, Eller learned that the advertising space awarded to the successful bidder was in highly desirable locations, contrary to what Eller had been led to believe. (*STI, supra*, 91 Cal.App.4th at p. 337.) Eller sent a letter to the MTA requesting that it produce all information and documents it possessed pertaining to the bid. (*Ibid.*) The MTA ultimately refused to produce three documents, which were exchanged by the MTA and STI after the MTA accepted STI's bid but before the parties finalized their license agreement. The first document was a memo from county counsel to its client, the MTA. The second document was a memo from STI's law firm to its client, STI. The third document was a cover letter from the MTA's director for real estate to the president of STI transmitting the first document, the legal memorandum prepared by county counsel. (*Id.* at pp. 337–338.) The MTA's director for real estate submitted a declaration stating that during negotiations with STI, she received a letter from STI requesting information concerning the MTA's position on certain matters involving the project. (*Id.* at p. 338.) The legal memorandum prepared by county counsel responded to the letter from STI, and it was transmitted to STI "to permit MTA and STI to better understand each other[']s position for the purpose of resolving certain issues surrounding negotiations relating to the license agreement under negotiation." (*Ibid.*)

Eller filed a petition for writ of mandate. The MTA and STI opposed the petition, asserting the attorney-client privilege as to documents shared between the MTA and STI concerning a legal opinion about the project. (*STI, supra,* 91 Cal.App.4th at p. 338.) Eller contended that no shared interest could exist until the MTA voted to award the project to STI, several months after the documents were exchanged. (*Ibid.*)

The Court of Appeal, Second District, Division Four, held there was a valid claim of privilege as to the three documents withheld by the MTA. (*STI, supra,* 91 Cal.App.4th at p. 341.) Specifically, the appellate court was not "persuaded that the attorney-client privilege is limited to litigation-related communications." (*Id.* at p. 340.) "Evidence Code sections 912 and 952 do not use the terms 'litigation' or 'legal communications' in their description of privileged disclosures, but specifically refer to 'the accomplishment of the purpose' for which the lawyer was consulted." (*Id.* at pp. 340–341.) According to the court, counsel prepared and circulated two of the documents "between two parties bound by an offer and acceptance in contemplation of a binding, detailed license agreement." (*Id.* at p. 341.) The third document was a transmittal letter between the parties discussing the topic of the legal memoranda. (*Ibid.*) "The evidence supports the contention that the disclosure of such documents was reasonably necessary to further the interests of both parties in finalizing negotiations for the license agreement." (*Ibid.*)

■■■ We agree with the court in *STI* that the nonwaiver principles expressed in Evidence Code sections 912 and 952 are not limited in application to communications disclosed to third parties during the course of litigation. The need to exchange privileged information may arise in the negotiation of a commercial transaction. (See Kopta, *Applying the Attorney-Client and Work Product Privileges to Allied Party Exchange of Information in California, supra,* 36 UCLA L.Rev. at p. 154.) As one federal court has recognized, "[b]y refusing to find waiver in these [commercial] settings courts create an environment in which businesses can share more freely information that is relevant to their transactions. This policy lubricates business deals and encourages more openness in transactions of this nature." (*Hewlett-Packard Co. v. Bausch & Lomb Inc.* (N.D.Cal. 1987) 115 F.R.D. 308, 311.)

Although the common interest doctrine may protect documents exchanged by parties to a commercial transaction, we agree with Calpine that the doctrine cannot be applied in a blanket manner to the 30 preacquisition documents without some understanding of the content of the documents and the necessity for disclosure. In *STI,* for example, the trial court conducted an in camera review of the three disputed documents, apparently without objection. (*STI, supra,* 91 Cal.App.4th at p. 339.) Here, the trial court relied

on general statements that all of the withheld communications were on matters of common interest and were reasonably necessary to accomplish the purpose for which lawyers were consulted. These unspecified claims of a common interest, applied generally to over 200 communications, are insufficient to protect the disputed documents from disclosure.

 Without further inquiry, it cannot be determined whether disclosure of the information in the 30 preacquisition documents was reasonably necessary to further the interests of both parties in concluding their transaction. The trial court must first conclude that the information contained in the documents is protected from disclosure by the attorney-client privilege or the work product doctrine; it must then determine whether the disclosures were reasonably necessary to accomplish the purpose for which the parties consulted their attorneys in finalizing the negotiations. Accordingly, we conclude that the trial court abused its discretion in denying Calpine's motion to compel as to the 30 preacquisition documents.

### 7. *Postacquisition Communications*

OXY contends that when a third party presents a demand adversely affecting two parties to a transaction, and causes both to consult with counsel and with each other, and exchange confidential communication relating to the third party's demand, those confidential communications protected by the attorney-client and work product privileges are not waived. According to OXY, the trial court erred by granting Calpine's motion to compel as to the 172 postacquisition documents.

In *Raytheon,* Raytheon and others were sued for contract and tort claims related to the toxic condition of sites located in Mountain View, California. (*Raytheon, supra,* 208 Cal.App.3d at p. 685.) The plaintiffs moved to compel after Raytheon refused to produce certain documents circulated among "adversarial" codefendants. (*Ibid.*) The documents were described by Raytheon as "draft reports and related correspondence generated during an administrative investigation of the toxic condition of the properties." (*Id.* at pp. 685–686.) According to Raytheon, the documents were distributed among codefendants and their counsel at counsel's direction, and the parties were not adversaries but were cooperating jointly with the investigating agencies so as to expedite remedial measures most efficiently. (*Ibid.*) The trial court ruled that Raytheon had waived all claims of attorney-client or work product protection with respect to documents shown to codefendants. (*Id.* at p. 685.) The Court of Appeal vacated the trial court's order and remanded the matter to the trial court, finding there "is no evidence developed in the record by which that court could determine whether work product was here disclosed under circumstances inconsistent with claiming the privilege. There is no

detailed description of the nature of the administrative investigation and the various interests each party had at stake during its progress; yet these facts are crucial to determining whether disclosure could reasonably be made with an expectation of confidentiality." (*Id.* at p. 689.)

Here, the trial court purported to rely on *Raytheon* in concluding that "[t]his case does not involve a complicated strict liability toxic clean-up situation, where it might be reasonably necessary for potentially responsible parties to exchange information for purposes of assessing potential allocation of liability." Although we would ordinarily be inclined to uphold the findings of the trial court, in this instance we cannot reconcile a conclusion that the preacquisition documents were protected from disclosure by the common interest doctrine with a conclusion that the postacquisition documents enjoyed no such protection. The common interest shared by OXY and EOG did not disappear once the transaction was consummated. In *STI,* for example, the court simply held it was reasonably necessary for parties finalizing negotiations to exchange certain privileged documents, but the court did not suggest that the parties' shared interests would not exist after the negotiations were finalized. (*STI, supra,* 91 Cal.App.4th at p. 341.) Indeed, the parties arguably had an even stronger common interest in preserving their transaction from attack by third parties such as Calpine after it was finalized and announced in a press release.

Calpine contends its January 11, 2000 letter was not a "pre-litigation" communication. It further contends OXY failed to present evidence as to why it was necessary to have 172 separate communications with EOG in order to advance its own legal consultation. Despite Calpine's characterization of its January 11, 2000 letter as a "contemporaneous business inquiry," the letter immediately established a risk of litigation in which OXY and EOG shared mutual interests and concerns. Indeed, the letter presented a demand that has led to litigation against both OXY and EOG. According to OXY, Calpine's claim will potentially unravel a complex transaction structured as a like-kind exchange of assets. Counsel for OXY has declared that she reasonably believed that Calpine's letter presented a threat of litigation. Furthermore, despite Calpine's dismissive explanation of the January 11, 2000 letter, Calpine has admitted that "[a]s soon as Calpine learned of the OXY-EOG transaction, it attempted to exercise its preferential right to purchase under the Operating Agreement."

█ We conclude the trial court abused its discretion in granting Calpine's motion to compel as to the 172 postacquisition communications. The record is not sufficiently developed to support the trial court's conclusion that mutual disclosures were not reasonably necessary to accomplish the purpose for which attorneys were consulted as to all of the

postacquisition communications. Calpine may be correct that there is no justification for 172 separate communications among the parties and counsel for OXY and EOG. However, on this record, we cannot say what was reasonably necessary. Like the court in *Raytheon,* we conclude that the trial court's finding that any applicable privileges underlying the 172 postacquisition communications were waived rests on an inadequate evidentiary basis.

8. *Standing to Assert the Common Interest Doctrine*

Calpine contends that OXY has no standing to object to the production of documents EOG possesses. Some of the documents EOG is withholding were generated by OXY and transmitted to EOG, and some were generated by EOG and transmitted to OXY. EOG asserts that it is withholding the documents at the request of OXY and has submitted no formal opposition to Calpine's motion, either here or in the trial court.

██ Contrary to Calpine's assertion, a party need not be in possession of documents to assert a claim of privilege, provided there has been no waiver of a privilege. In the case of the attorney-client privilege, the client is the holder of the privilege and can "prevent another from disclosing" a confidential communication between the client and lawyer. (Evid. Code, § 954.) The attorney, rather than the client, is the holder of work product protection, and the attorney can assert the privilege even though the attorney is not in possession of the document. (*Lasky, Haas, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264, 271 [218 Cal.Rptr. 205].)

If the predicate findings for application of the common interest doctrine are present, it is immaterial that the documents are in the possession of EOG. The fundamental question is not who possesses the documents; the relevant focus is whether the party claiming the privilege has demonstrated the documents are privileged and that there has been no waiver by disclosure. Accordingly, provided there has been no waiver by disclosure, OXY or its attorneys can prevent EOG from disclosing privileged documents generated by OXY and transmitted to EOG.

The same is not true, however, of the documents prepared by EOG and transmitted to OXY. ██ As discussed above, a party seeking to invoke the common interest doctrine must first establish that the communicated information would otherwise be protected from disclosure by a claim of privilege. There is no underlying claim of privilege because EOG, which authored the documents, does not contend the documents are privileged. If EOG had not transmitted the documents to OXY, the documents would be subject to disclosure. Merely transmitting the documents to OXY does not

render them privileged. Therefore, we conclude the trial court erred to the extent it denied the motion to compel the production of documents generated by EOG as to which EOG asserts no claim of privilege.

DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order of December 23, 2002, granting in part and denying in part Calpine's motion to compel. The respondent court shall consider OXY's claims of privilege and Calpine's claims of waiver in light of the principles discussed in this opinion. In particular, documents shall not be protected from disclosure solely because they concern matters of common interest and are exchanged among OXY, EOG, and their attorneys. In ruling upon a claim that documents are protected by the Joint Defense Agreement, the trial court must first establish that the documents are protected by either the attorney-client privilege or the attorney work product doctrine. The trial court must then determine that there was a reasonable expectation the communications would be maintained in confidence and that the disclosures were reasonably necessary for the purpose for which attorneys were consulted. This determination will invariably hinge on the content and context of the communication. In order to assess the claims of common interest and the necessity of disclosure, the trial court may conduct an in camera review of the disputed documents.

Our temporary stay order shall remain in effect until this opinion is final. Each party shall bear its own costs in this writ proceeding.

McGuiness, P. J., and Pollak, J., concurred.

On March 4, 2004, the opinion was modified to read as printed above.