Filed 7/8/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS FOR CERES,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>    Respondent;<br><br>CITY OF CERES et al.,<br><br>    Real Parties in Interest. | F065690<br><br>(Super. Ct. No. 670117)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Hurl W. Johnson III, Judge.

Herum Crabtree, Brett S. Jolley and Natalie M. Weber for Petitioner.


No appearance for Respondent.

Michael L. Lyions, City Attorney; Meyers, Nave, Riback, Silver & Wilson, Amrit S. Kulkarni and Edward Grutzmacher for Real Party in Interest City of Ceres.

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV, and V of the Discussion.

K & L Gates, Edward P. Sangster for Real Parties in Interest, Wal-Mart Stores, Inc., and Wal-Mart Real Estate Trust.

Jennifer B. Hennings for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Respondents, City of Ceres, Wal-Mart Stores, Inc., and Wal-Mart Real Estate Trust.

-ooOoo-

This case involves a challenge under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[1] (CEQA) to a decision by the City of Ceres (city) to grant approvals necessary to build a shopping center anchored by a Wal-Mart store. The challenger, Citizens for Ceres, has petitioned this court for writ relief from the trial court's order upholding claims by the city and the developer that hundreds of documents be excluded from the administrative record because they are protected by the attorney-client privilege or the attorney work-product doctrine.

The dispute over these documents arose when the challengers pointed out that the administrative record prepared and certified by the city included no communications between the city and the developer. The city responded that the project had "the potential to be controversial"; that such communications therefore "were always made by and between legal counsel" for the city and the developer; and consequently all the communications were privileged. The challenger filed a motion to augment the

administrative record by compelling the city to include the assertedly privileged communications. The trial court denied the motion, leading to these writ proceedings.

---

[1]Subsequent statutory references are to the Public Resources Code unless otherwise noted.

We reject the challenger's argument that CEQA's provisions defining the administrative record abrogate the attorney-client privilege and the attorney work-product doctrine. Those CEQA provisions do not reflect an intent on the part of the Legislature to eliminate privileges wholesale.

We conclude, however, that the common-interest doctrine, which is designed to preserve privileges from waiver by disclosure under some circumstances, does not protect otherwise privileged communications disclosed by the developer to the city or by the city to the developer *prior* to approval of the project. This is because, when environmental review is in progress, the interests of the lead agency and a project applicant are fundamentally divergent. While the applicant seeks the agency's approval on the most favorable, least burdensome terms possible, the agency is duty bound to analyze the project's environmental impacts objectively. An agency must require feasible mitigation measures for all significant impacts and consider seriously and without bias whether the project should be rejected if mitigation is infeasible or approved in light of overriding considerations.

The applicant and agency cannot be considered to be advancing any shared interest when they share legal advice at the *preapproval stage*. Under established principles, this means that the common-interest doctrine does not apply. *After* approval, by contrast, the agency and applicant have a united interest in defending the project as approved, and privileges are not waived by disclosures between them from that time onward. In making this distinction between preapproval and postapproval disclosures, we potentially disagree with *California Oak Foundation v. County of Tehama* (2009) 174 Cal.App.4th 1217, 1222-1223 (*California Oak*), in which the court found the common-interest doctrine to be applicable to postapproval disclosures between an applicant and a lead agency and

perhaps also to preapproval disclosures between them. We will grant writ relief to allow the trial court to apply the rule we have stated.

In the unpublished portion of the opinion, we consider several additional topics. First, we discuss the showing necessary to establish the common-interest doctrine's protection for any postapproval communications for which it may be claimed. Second, there are many other assertedly privileged documents that were not disclosed between the city and the developer. It will still be necessary for the trial court to reexamine those privilege claims because the court applied an incorrect standard in upholding them. In upholding all the challenged privilege claims without exception, the court expressed the view that the party asserting a claim of privilege need only assert it to obtain protection. In reality, the party asserting the privilege is required to make a showing of preliminary facts supporting the privilege. The court made no findings of these preliminary facts, and there is no substantial evidence in the record that would have supported those findings for any document. The city will be permitted to amend its submissions to make the necessary showings.

Next, some of the assertedly privileged documents are also claimed by the city to be excludable from the administrative record because they are "drafts" within the meaning of section 21167.6, subdivision (e)(10). The parties have a dispute over the scope of this exclusion. More broadly, the city argues that, even if none of the documents at issue are protected by privileges, they all belong to a phase of the environmental review that is excluded from the administrative record. This argument is based on a reading of section 21167.6, subdivision (e)(10), which, we conclude, it is unnecessary for us to rule upon in these writ proceedings. The trial court has not yet made any ruling on the subject and should do so in the first instance if necessary.

Finally, we reject four arguments for denying writ relief which are based on the allegations that: (1) the challenger forfeited most of its challenges to the privilege claims by not presenting them properly in the trial court; (2) the challenger has not made a showing of prejudice; (3) the challenger failed to exhaust administrative remedies; and (4) the writ petition in this court is defective in form.

4.

We issue a writ of mandate requiring the trial court to reconsider the claims of privilege in light of the holdings in this opinion.

## FACTUAL AND PROCEDURAL HISTORIES

Real parties in interest Wal-Mart Stores, Inc. and Wal-Mart Real Estate Trust (the developer) applied to the city for land-use approvals necessary to build a 300,000-square-foot shopping center anchored by a 200,000-square-foot Wal-Mart store. On September 12, 2011, the city certified an environmental impact report (EIR) and approved the project. The challenger initiated proceedings in the superior court, claiming the city failed to comply with CEQA.

After the city prepared a draft index for the administrative record, the challenger sent a letter to the city, stating:

> "The index … does not appear to include a single informal communication (such as [an] email or memo) between the agency and its consultants or the applicant. In my experience representing applicants as well as my experience with CEQA administrative records, there are typically lengthy communications between the applicant and the agency in this form and these are appropriately included in the record .… Yet the index is completely devoid of such communications or notes. In fact, it does not appear the agency staff/consultant e-mail accounts were reviewed for Communications related to this matter. Please explain whether this is an oversight that will be corrected or a deliberate omission. [¶] If the latter, please explain the basis for the omission and if claimed for reasons of privilege, please provide a privilege log or similar device .…"

Counsel for the city answered in a letter stating that the omissions of communications between the city and the developer were deliberate and based on privilege. The city had deliberately structured all communications to be privileged because it anticipated that the project would be controversial and could lead to litigation, and that the city had no intention of providing any information at all about the withheld documents:

5.

"From the very earliest stages of the City's consideration of this project, it was clear that the project had the potential to be controversial and that there was a relatively high risk of litigation. Thus, from the very earliest stages of the City's consideration of the project, both the City and the project applicant retained legal counsel to assist with, and oversee compliance with CEQA and all other relevant laws and regulations. Communications, therefore were always made by and between legal counsel. These communications are protected from disclosure by the attorney-client privilege, the [attorney work-product] doctrine, the legislative privilege, the joint defense privilege, and, potentially, other privileges and protections. CEQA does not require the City to include any such privileged or protected documents in the administrative record or to waive any of these protections and privileges in preparing an administrative record. CEQA also does not require the preparation of a privilege log, as you have requested, and the City will not provide any such privilege log."

On December 19, 2011, the city certified the administrative record without including any of these communications.

The challenger filed an objection to the certification of the record because of the omission of the communications. Later, the challenger filed a motion asking the trial court to order the city to augment the administrative record to include them. The motion argued that communications between the city and the developer, as well as the city's internal communications, were required to be included in the administrative record by section 21167.6, subdivision (e). The challenger further argued that, because section 21167.6 states that it applies "'notwithstanding any other provision of law,'" no privileges applied.

In its opposition to the motion, the city informed the court that it had agreed to provide a privilege log, although it continued to maintain that it was under no obligation to do so. The log, as later supplemented, listed 3,311 documents. An overwhelming majority of the log entries indicated that the city was claiming the attorney-client

privilege, the protection of the attorney work-product doctrine, or both. Many entries also indicated that, although the documents were disclosed between the city and the developer,

6.

waiver of privileges was prevented by the common-interest doctrine. The log actually refers to a joint-defense privilege, but, as we will explain, California has no joint-defense privilege. The city's intention was to refer to the nonwaiver effect of the common-interest doctrine.

The city explained that there also were two groups of documents withheld for reasons other than privilege. One group was "administrative draft documents or documents not otherwise released to the public." The other was documents related to a development agreement that was expected to be part of the project at an earlier stage but that had since been abandoned.

As far as we can tell from the record, the city provided little information on the basis of which it would be possible to determine whether any of the claimed privileges or protections applied. A total of about three dozen names appear in the privilege log as the names of people by or to whom documents were sent. With a few exceptions, however, neither the log nor any declaration supporting it provides any information identifying these people, stating which of them are attorneys or clients, or explaining which parties they represented or worked for. From the record as a whole, we have been able to identify six of them as attorneys for the city or the developer. There was, however, no straightforward way to identify the other 30 or so individuals listed. Further, although the record contains four declarations related to the assertedly privileged documents, none of these state the declarants' personal knowledge that any of the documents were communications made in the course of an attorney-client relationship or were the work product of an attorney, with the exception of four items said to be attorney work product. Two declarations stated that the city and the developer sometimes disclosed privileged communications to each other and did so in pursuit of their common interests and with the

expectation that the communications would remain confidential. The declarations did not, however, state that this was true, to the declarants' personal knowledge, regarding

any or all of the common-interest documents listed in the log except for four documents. For about 650 other documents where the protection of the common-interest doctrine is claimed in the log, there are no supporting facts.

The court held its first hearing on the motion to augment on April 20, 2012. The parties had formal meet-and-confer discussions in a jury room, and the hearing was continued. After the April 20 hearing, the challenger provided the city with a list of 2,275 privilege claims that it was disputing. On May 18, 2012, the city sent a chart indicating its responses regarding these disputed items. The responses indicated that the city had decided to disclose, and had already disclosed, a significant number of the documents. For the majority, however, the city adhered to its privilege claims—at least provisionally.

In a letter to the court dated May 23, 2012, describing the "issues that still remain between the parties," the challenger reserved its right to maintain its challenges to the 2,275 items about which the city had supplied responses:

> "[O]n May 18, 2012 the City provided responses … to the Initial and Supplemental log lists of requested documents provided by Petitioner on April 20th and April 25th, respectively. Because these responses were not provided in conjunction with documents produced on May 7th, Petitioner has not had sufficient time to review these responses yet to determine their adequacy and/or whether they further answer issues raised herein. Thus, Petitioner reserves the right to object to any changes to the privilege logs or the City Responses."

In a letter to the court dated May 24, 2012, the city stated that its review of the 2,275 challenges "has provided the opportunity to make necessary changes to the privilege log," and it would submit an amended log "when the City is sure that no further changes will need to be made." This implied the city was uncertain which of its privilege claims actually were valid.

In his letter to the court dated May 23, 2012, the challenger's counsel described the city's production of "thousands of documents" after the April 20 hearing. These are

8.

documents conceded to be within CEQA's description of the administrative record in section 21167.6, subdivision (e), but omitted from the administrative record that was certified by the city on December 19, 2011. Instead of promptly submitting these documents to the court to be included in the administrative record, the city apparently expected the challenger to review them and determine which ones it wanted to include. The city's position was that it did not object to the inclusion of any of them. In a letter to opposing counsel dated May 7, 2012, counsel for the city remarked that, although the privilege log "references a large number of administrative draft sections of the EIR," he found that it was "nearly impossible to match these documents to specific entries on the privilege log" his office had prepared months before. Further, the privilege log itself includes many entries for which privileges are claimed but no individuals are named as those participating in the communication. Ninety-three of these entries still had not been corrected by the time the parties submitted their final briefs preceding the July 6, 2012, hearing. This indicates that, at the time the city certified the administrative record and for seven months afterward, it never made a final determination of the documents it believed should be included in the administrative record or of the documents it wanted to claim it could withhold and why.

The court held another hearing on May 25, 2012. The court and parties discussed four categories of documents and agreed there were no other categories. The court and parties also expressed an expectation that the list of disputed documents would be narrowed by the time of the next hearing, so that the city and the developer could give a general indication of the substance and purpose of the documents, the challenger could make arguments based on that additional information, and the court could rule. The court stated that, after the parties had determined the set of documents remaining in dispute,

they would submit simultaneous briefs arguing for and against the privilege claims on those documents. The court and parties did not refer to any specific limitation on the number of documents that could or would ultimately remain in contention.

When the simultaneous briefs were filed on June 26, 2012, it was obvious that the parties had not reached any agreement about the number of documents that remained in contention. The challenger attached to its brief a list of more than 500 documents and asked the court to order their disclosure. The city's brief discussed 25 documents, implying that only these remained in dispute, while the developer's brief asserted that the parties "have boiled the disputed issues down to" 19 documents and redactions in 13 other documents.

The belief of the city and the developer that a drastic reduction in the scope of the dispute had taken place appears to be based on the challenger's letter of June 14, 2012, in which the challenger discussed 50 documents. That letter did not, however, state that it contained the challenger's list of the privilege claims being challenged. Instead, it explained that it contained the challengers' remarks on certain documents the city and developer had *already produced,* some of which the challengers were arguing should be included in the administrative record. It also stated the challengers' responses to a *new* set of privilege claims asserted by the city in a recent letter. The letter did not contain any agreement to abandon the challenges to any of the privilege claims.

On June 29, 2012, counsel for the city and the developer wrote to counsel for the challenger to express their "outrage" at the fact that a large number of documents remained in dispute; they claimed there was an "extreme disconnect" between the challenger's statements at the May 25 hearing and its list of disputed documents in its June 26 brief. Counsel for the challenger wrote back that the challenger "has repeatedly stated that [it] does not waive any rights or claims to documents" and "has never agreed to limit its request" for documents in the manner the city and the developer assumed.

10.

The final hearing on the challenger's motion to augment the administrative record took place on July 9, 2012. The court expressed surprise that a large number of documents was still in dispute. "I got the impression we were down to 30-some odd documents," it said. This impression appears to have been derived from the city and developer's submissions alone, since the challenger's brief included a list of more than 500 disputed documents. The city's attorney said there were "[c]lose to 700," the developer's attorney agreed, and the court often referred to that figure, but we have found no basis for it in the record.

The court indicated that if there had been a small number of documents, and if the city had been willing to provide them for in camera review, there would have been no problem. On the other hand, with the large number of documents that the city was unwilling to produce, the court did not know how to cope with the task of ruling on the privilege claims:

> "I thought we were down to 32 or 35, something manageable based upon these letters that I got … so I came in here with the idea today, hey, I got 30-some odd documents I have to look at. Hopefully the city attorney will give me some of these things that may be attorney/client privilege, so I can look at that small universe of documents, and then I can make a decision. [¶] Whichever way I can make a decision, I disclose some of those 30-odd documents or some of them I would or maybe I wouldn't disclose any, but then I'd have a nice packet. And I'd seal it up and say, here, do what you want with it if somebody wants to take a writ. [¶] But what am I supposed to do with 700 of these things? How do I make a determination if 700 documents I'm not being shown qualifies as attorney/client privilege? [¶] Anyone?"

The court later said it felt "blindsided" by the fact that the challenger was still challenging several hundred of the city's original 3,311 privilege claims. "I went from 32 documents, and now I'm supposed to do 700," it added, again apparently relying on the city's and the developer's representations about only a few documents being in dispute.

"That's not what I had in mind." A moment later, it said, "And I'm not going to look at 700, so give me an example." Still later, it said, "I thought okay, well, 32, I can do 32. No problem. I can't do 700 .…"

Several times, the court stated its view that a party asserting a privilege had no burden beyond the mere assertion itself, while the party opposing the privilege claim had a burden of proving the privilege was inapplicable:

> "You have the burden. They claim attorney/client privilege. They have the right to claim that as officers of the court. It's your obligation, your burden, to tell me why they're not attorney/client privilege. [¶] … [¶]
>
> "You have the burden to say what they're saying as officers of the court is not true. That's what you have to do on this thing.… [¶] … [¶]
>
> "They're officers of the Court. They're claiming a privilege, which I cannot force them to give up. Then the law says under privileges, attorney/client, just about any other privilege, the person … who wants to say it's not claimed by a privilege, has the burden to show that it's not within a privilege.… [¶] … [¶]
>
> "They don't have to tell me why it is attorney/client privilege. They can say, Judge, mind your own business. We're claiming a privilege. That's what the law says."

Finally, saying "I don't know what else to do with this," and "I'm getting to the point where we need to get this thing resolved one way or the other," the court made a blanket ruling upholding all the privilege claims[2] on the ground that the city and the developer had asserted the claims and the challenger had not disproved their applicability:

---

[2]In a number of places, the city and developer assert that the court refused to rule on all but a few of the city's privilege claims because it felt the challenger had not made timely challenges to the others. As will be seen, the record does not support this view. The court never stated that the challenger forfeited any of its challenges or that any of the city's privilege claims were being upheld through some kind of default. The record can reasonably be read only as showing that the court upheld all the privilege claims on their merits.

12.

"I'm making the finding you have as officer of the court, they have the right to say attorney/client work product. They have done so.… You can't make your requirement … to show me that it's not carried, and it's not protected by attorney/client or work product.… [¶] I'm not going to order any further review on these attorney/client [or] work product."

After discussing some other matters, the court set a hearing on October 5, 2012, for determination of the merits, with the challenger's opening brief due on August 24.

The challenger filed its petition for a writ of mandate in this court on September 7, 2012, seeking relief from the trial court's order. The petition argues that the allegedly privileged documents should be ordered included in the administrative record because section 21167.6 renders all privileges inapplicable. Alternatively, the petition argues that several hundred of these documents should be ordered included in the administrative record because respondents never made the necessary showing of preliminary facts to establish that the privileges apply to the documents for which they are claimed.

We issued a stay order on September 17, 2012. On the same day, the city filed a "Preliminary Opposition" to the writ. On September 18, 2012, Wal-Mart filed an "Informal Opposition."

The preliminary and informal opposition briefs make six arguments: (1) The matter is not ripe for review because the trial court has not filed a written order embodying its ruling from the bench, and Court of Appeal, Fifth District, Local Rules of Court, rule 3(b) (rule 3(b)), requires a "a copy of the order or judgment from which relief is sought" to be attached to the writ petition. (2) The city and developer "are currently asking the trial court to directly address" their purported failure to establish the preliminary facts necessary to show that privileges apply and "intend to ask the Superior Court to defer entry of an order pending preparation of a new privilege log by the City." (3) The challenger forfeited its arguments because it blindsided the city and developer in the trial court by stating in its final brief before the hearing that several hundred documents were at issue. (4) The challenger has not shown that it will be prejudiced at

13.

trial by its lack of access to the withheld documents. (5) Having no access to the withheld documents, the challenger was not able to raise any issue that might be found in them during the administrative proceedings, so the challenger has failed to exhaust its administrative remedies for any issue that might be found in them. (6) Section 21167.6 does not supersede the attorney-client privilege or the attorney work-product doctrine.

On October 3, 2012, we issued an order to show cause why relief should not be granted. Included in the order to show cause was a briefing order, stating:

> "The parties' submissions should include, but need not be limited to, responses to the following questions:
>
> "1.     Did respondents sustain their burden of establishing preliminary facts necessary to support all their claims of attorney-client privilege and attorney work product protection? If not, what additional declarations or other evidence must they submit to sustain this burden? Is their burden different when the privilege log shows that an attorney merely received a 'cc' of a document?
>
> "2.     For communications between the city and its attorneys and for work product of the city's attorneys, disclosure to Wal-Mart waives privileges unless the common interest doctrine applies. Likewise, for communications between Wal-Mart and its attorneys and for work product of Wal-Mart's attorneys, disclosure to the city waives privileges unless the common interest doctrine applies.
>
> "(a)     For privilege log entries that show disclosure between the city and Wal-Mart, which side has the burden of showing that privileges are or are not preserved under the common interest doctrine? What facts must be shown? What kinds of evidence can show those facts? Does the record contain substantial evidence on the basis of which the trial court could find that the doctrine protected each document for which it was claimed, assuming respondents had a burden of producing such evidence? Should the trial court have conducted an in-camera review to determine whether the common-interest doctrine applies to each document for which it was claimed? (See *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874.)

14.

"(b)    In light of a lead agency's position under CEQA as an objective decision-maker, should communication between an applicant and lead agency that takes place *before* the agency has completed environmental review and approved the project be deemed to be generally outside the common interest doctrine?  (Cf. [*California Oak, supra,*] 174 Cal.App.4th 1217, 1222-1223 [stating that in CEQA litigation by challenger against applicant and lead agency, 'disclosing the [legal] advice to a codefendant *in the subsequent joint endeavor to defend the EIR in litigation*' does not waive privileges because of the common interest doctrine (italics added)].)

"3.    Besides those already discussed in the petition and in respondents' informal opposition briefs, are there any arguments or authorities that would help the court to determine whether the clause '[n]otwithstanding any other provision of law' in Public Resources Code section 21167.6 should be construed as superseding or limiting any privileges?  (See, e.g., Remy, et al., Guide to CEQA (11th ed. 2006) pp. 859-861.)

"4.    According to the privilege log, many of the items challenged by petitioner not only are privileged, but also are excluded from the administrative record because they are 'drafts' within the meaning of Public Resources Code section 21167.6, subdivision (e)(10).  Does petitioner intend to challenge the 'draft' designation of these items, or instead to concede that because of the designation, petitioner's challenges to the privileges claimed for those items are moot?  If petitioner intends to challenge the designations, what are the grounds for the challenge?

"If petitioner states in its traverse that it intends to challenge the 'draft' designations, respondents will be permitted to file an additional brief in response within 10 business days after the filing of the traverse."

The city and developer filed returns in which they expanded on their earlier arguments and responded to the court's questions.  The challenger filed a traverse, responding to the court's questions and stating that it intended to continue to challenge the "draft" designations.  The city filed a reply to the traverse.  We granted leave to amici curiae California State Association of Counties and League of California Cities to file a joint brief in support of the city and the developer.

## DISCUSSION

### I.    CEQA does not abrogate privileges generally

The challenger's most sweeping argument is that section 21167.6, subdivision (e), supersedes evidentiary privileges because it requires materials to be included in the administrative record "notwithstanding any other provision of law." If correct, this would necessitate an order directing the trial court to reject all the city and developer's privilege claims and require all documents within CEQA's definitions to be included in the administrative record. We reject this argument.

Section 21167.6 provides:

> "Notwithstanding any other provision of law, in all actions or proceedings brought pursuant to [CEQA's judicial review provisions], except those involving the Public Utilities Commission, all of the following shall apply: [¶] … [¶]

> "(e)    The record of proceedings shall include, but is not limited to, all of the following items:

> "(1)    All project application materials.

> "(2)    All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project.

> "(3)    All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division.

> "(4)    Any transcript or minutes of the proceedings at which the decisionmaking body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project.

16.

"(5)    All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project.

"(6)    All written comments received in response to, or in connection with, environmental documents prepared for the project, including responses to the notice of preparation.

"(7)    All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project.

"(8)    Any proposed decisions or findings submitted to the decisionmaking body of the respondent public agency by its staff, or the project proponent, project opponents, or other persons.

"(9)    The documentation of the final public agency decision, including the final environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3), cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division.

"(10)    Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division.

"(11)    The full written record before any inferior administrative decisionmaking body whose decision was appealed to a superior administrative decisionmaking body prior to the filing of litigation."

Section 21167.6 also provides that the lead agency "shall prepare and certify the record of proceedings" and "shall lodge a copy of the record of proceedings with the court …." (§ 21167.6, subd. (b)(1).)

17.

Recently in *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48 (*Madera Oversight*), we made several observations about the contents of the administrative record as defined by these provisions. First, the language is mandatory: The administrative record *shall* include the listed items. Second, the list is nonexclusive; the administrative record's contents include, but are not limited to, the listed items. (*Id.* at pp. 63-64.) Next, the administrative record as defined is very expansive. We quoted language that originated in one Court of Appeal case and was subsequently quoted in another: Section 21167.6 "'"contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that development."'" (*Madera Oversight, supra*, at p. 64.) Fourth, the Court of Appeal does not directly review the agency's decisions about what to include in the administrative record. Instead, it reviews the trial court's decision on a party's motion relating to the administrative record. It reviews the trial court's findings of fact for substantial evidence and its conclusions of law de novo. (*Id.* at p. 65.) An appellant must affirmatively demonstrate error. Where

the record is silent, the appellate court accepts all presumptions that support the trial court's decision, including the presumption that the trial court made any necessary implied findings, so long as those findings are supported by substantial evidence. (*Id.* at p. 66.)

Several provisions of section 21167.6, subdivision (e), are of significance in this case, as they would require inclusion in the administrative record of types of documents the city apparently withheld, unless privileges are applicable and have not been waived by disclosure. Subdivision (e)(7)—requiring inclusion of all "written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with [CEQA] or with respect to the project"—encompasses

correspondence between the applicant and agency pertaining to the project. Subdivision (e)(10) includes "all internal agency communications, including staff notes and memoranda related to the project or to compliance with [CEQA]." Any materials for which the city claimed a privilege because they were communications among city staff in which the city's counsel was included would fall within this provision, but for the privilege. Other provisions could be at issue as well. For instance, if an attorney was involved in the communication, the city might have withheld "staff reports and related documents prepared by the respondent public agency" that are relevant to CEQA compliance, the agency's action on the project, or the agency's findings, and that would belong in the administrative record if privileges are not applicable. (§ 21167.6, subd. (e)(2), (3).)

The challenger contends that, because section 21167.6, subdivision (e), applies "notwithstanding any other provision of law," its plain meaning requires inclusion in the administrative record even of documents that fall within the attorney-client privilege and the attorney work-product doctrine. The challenger relies on the fact that, generally speaking, the expression "'notwithstanding any other provision of law'" is "a '"term of art"' … that declares the legislative intent to override all contrary law." (*Klajic v. Castaic Lake Water Agency* (2004) 121 Cal.App.4th 5, 13.) The city and developer rely on *California Oak, supra*, 174 Cal.App.4th at page 1221, which held that "[s]ection 21167.6 is not an abrogation of the attorney-client privilege or work product" doctrine. As the challenger points out, however, the *California Oak* opinion does not discuss the effect of the phrase "notwithstanding any other provision of law."

We begin with a brief review of the attorney-client privilege, the attorney work-product doctrine, and the purposes of both. A lawyer's client has a privilege to refuse to disclose a confidential communication between the lawyer and the client made in the course of the lawyer-client relationship. (Evid. Code, §§ 952, 954.)

19.

"The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship. [Citations.] Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply. [Citations.]" (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 (*Costco*).)

The party claiming the privilege usually makes the preliminary showing via declarations. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 8:192, p. 8C-52.) In general, the court cannot require disclosure for in camera review of materials assertedly protected by attorney-client privilege. (Evid. Code, § 915; *Costco, supra*, 47 Cal.4th at pp. 736-737.)

The attorney work-product doctrine provides two levels of protection for attorney work product—absolute protection and qualified protection:

"(a) A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances.

"(b) The work product of an attorney, other than a writing described in subdivision (a), is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Code Civ. Proc., § 2018.030.)

Work produced by an attorney's agents and consultants, as well as the attorney's own work product, is protected by the attorney work-product doctrine. (*Scotsman Mfg. Co. v. Superior Court* (1966) 242 Cal.App.2d 527, 531.)

The attorney is the holder of this privilege. (*Lasky, Hass, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264, 271.) A party asserting the privilege must "prove the preliminary facts to show that the privilege applies." (*Mize v. Atcheson, Topeka & Santa Fe Ry. Co.* (1975) 46 Cal.App.3d 436, 447.) When a party asserts the absolute privilege, the court cannot require the material to be produced for in camera

review to evaluate the claim of privilege, but the court can require production for in camera review when the party asserts only the qualified privilege. (Evid. Code, § 915.) An opposing party seeking to overcome a claim of qualified privilege has the burden of establishing prejudice. (*Coito v. Superior Court* (2012) 54 Cal.4th 480, 499.)

The purpose of the attorney-client privilege is to enhance the effectiveness of our adversarial legal system by encouraging full and candid communication between lawyers and clients. (See, e.g., *City & County of San Francisco v. Superior Court* (1951) 37 Cal.2d 227, 235.) The purposes of the work-product doctrine are to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases," and to "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018.020.)

The question presented here is difficult. *California Oak* does not explain why "any other provision of law" does not include the provisions establishing privileges. *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363 (*Roberts*), on which the city and

developer also rely, does not present an analogous situation. There, our Supreme Court held that the Public Records Act and the Brown Act did not abrogate the attorney-client privilege and require disclosure of an attorney's letter communicating legal advice to a city council. Both the Public Records Act and the Brown Act, however, have provisions *expressly* making exceptions to disclosure for privileged communications. (*Roberts, supra,* at pp. 370, 379.) CEQA does not.

Despite the lack of controlling authority, we are persuaded that section 21167.6 does not mean agencies must disregard all privileges when assembling CEQA administrative records. Courts are required to go cautiously when interpreting statutes that might either expand or limit privileges, for we are forbidden to create privileges or establish exceptions to privileges through case-by-case decisionmaking. (Evid. Code,

21.

§ 911, subd. (b) [no privileges exist except by statute]; *Roberts, supra*, 5 Cal.4th at p. 373 [courts may not find implied exceptions to privileges]; *Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 99 [same].)

The area of privilege is "one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme." (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 911, p. 219.) Knowing this (see *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 779, fn. 3 [Legislature presumed aware of all existing law when it acts]; *Bailey v. Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [same]), the Legislature did not likely intend to make CEQA administrative records a privilege-free zone by the indirect means of placing the phrase "notwithstanding any other provision of law" at the beginning of section 21167.6, four subdivisions away from the administrative-record provisions in subdivision (e). Our Supreme Court has explained that the policies behind the attorney-client privilege are just as applicable when the client is a public agency as in other contexts:

> "Open government is a constructive value in our democratic society. [Citations.] The attorney-client privilege, however, also has a strong basis in public policy and the administration of justice. The attorney-client privilege has a venerable pedigree that can be traced back 400 years.… It is no mere peripheral evidentiary rule, but is held vital to the effective administration of justice. [Citation.] The privilege promotes forthright legal advice and thus screens out meritless litigation that could occupy the courts at the public's expense.… [¶] A city council needs freedom to confer with its lawyers confidentially in order to obtain adequate advice, just as does a private citizen who seeks legal counsel …. The public interest is served by the privilege because it permits local government agencies to seek advice that may prevent the agency from becoming embroiled in litigation, and it may permit the agency to avoid unnecessary controversy with various members of the public." (*Roberts, supra*, 5 Cal.4th at pp. 380-381.)

Similar considerations apply to the attorney work-product doctrine. In light of all this, we believe that if the Legislature had intended to abrogate all privileges for purposes of compiling CEQA administrative records, it would have said so clearly.

Our conclusion does not render meaningless the phrase "notwithstanding any other provision of law" in section 21167.6. The phrase applies to the whole of section 21167.6, not just subdivision (e). One main effect the phrase has is to distinguish CEQA's mandamus procedures from some of the procedures for mandamus actions generally, which are set out in the Code of Civil Procedure.

For all these reasons, we conclude that section 21167.6 does not abrogate the attorney-client privilege or the attorney work-product doctrine.

## II. The common-interest doctrine does not protect agency-applicant disclosures made before project approval

The challenger argues that, because the interests of a lead agency and a project applicant diverge fundamentally while the project application is pending, the common-interest doctrine does not operate to prevent waiver of privileges when the agency and applicant disclose communications to each other during the application's pendency. We agree.

The dispute over the administrative record in this case began when the challenger noticed that the record certified by the city contained no communications between the city and the developer. The city responded by saying that all these communications were privileged because they were made through counsel, and privileges were not waived by disclosure because of the common-interest doctrine. The doctrine therefore is central to the case.

The common-interest doctrine allows disclosure between parties, without waiver of privileges, of communications protected by the attorney-client privilege or the attorney work-product doctrine where the disclosure is necessary to accomplish the purpose for

23.

which the legal advice was sought.  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial, *supra,* ¶ 8:199.10, pp. 8C-55 to 8C-56.)  The doctrine is not an independent privilege but a doctrine specifying circumstances under which disclosure to a third party does not waive privileges.  (*OXY Resources California LLC v. Superior Court, supra,* 115 Cal.App.4th at p. 889 (*OXY Resources*).)  It does *not* mean there is "an expanded attorney-client relationship encompassing all parties and counsel who share a common interest."  (*Ibid.*)

The doctrine is based on Evidence Code sections 912 and 952:

"A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege) …, when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer … was consulted, is not a waiver of the privilege." (Evid. Code, § 912, subd. (d).)

"As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Evid. Code, § 952.)

Although these provisions deal specifically with the attorney-client privilege, the same considerations apply to waiver or nonwaiver of the work-product doctrine.  (*OXY Resources, supra*, 115 Cal.App.4th at p. 891.)

The *OXY Resources* court stated the elements of the common-interest doctrine:

"Applying these waiver principles in the context of communications among parties with common interests, it is essential that participants in an exchange have a reasonable expectation that information disclosed will remain confidential.  If a disclosing party does not have a reasonable expectation that a third party will preserve the confidentiality of the information, then any applicable privileges are waived.  An expectation of

24.

confidentiality, however, is not enough to avoid waiver. In addition, disclosure of the information must be reasonably necessary for the accomplishment of the purpose for which the lawyer was consulted. [Citation.] Thus, '[f]or the common interest doctrine to attach, most courts seem to insist that the two parties have in common an interest in securing legal advice related to the same matter—and that the communications be made to advance their shared interest in securing legal advice on that common matter.'" (*OXY Resources, supra*, 115 Cal.App.4th at p. 891.)

Applications of Evidence Code sections 912 and 952 can be divided into two categories. The first is where the third party has no interest of his or her own in the matter, but a litigant must disclose a confidential communication to the third party because the third party is an agent or assistant who will help to advance the litigant's interests. This is the category the Law Revision Commission described in commenting on Evidence Code section 912, subdivision (d) (which deals with necessary disclosures for purposes of various privileges, not just the attorney-client privilege), as part of the report it issued when the Evidence Code was proposed for adoption in 1965:

"Subdivision (d) is designed to maintain the confidentiality of communications in certain situations where the communications are disclosed to others in the course of accomplishing the purpose for which the lawyer, physician, or psychotherapist was consulted. For example, where a confidential communication from a client is related by his attorney to a physician, appraiser, or other expert in order to obtain that person's assistance so that the attorney will better be able to advise his client, the disclosure is not a waiver of the privilege, even though the disclosure is made with the client's knowledge and consent. Nor would a physician's or psychotherapist's keeping of confidential records necessary to diagnose or treat a patient, such as confidential hospital records, be a waiver of the privilege, even though other authorized persons have access to the records. Communications such as these, when made in confidence, should not operate to destroy the privilege, even when they are made with the consent of the client or patient." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 162.)

The second category is where the third party is not in any sense an agent of the litigant or attorney but is a person with interests of his or her own to advance in the matter, interests that are in some way aligned with those of the litigant. In its comment on

25.

Evidence Code section 952 (dealing with the attorney-client privilege specifically), the Law Revision Commission reiterated much of what it said about section 912, but added a remark about disclosures bearing upon a matter of "joint concern":

> "Confidential communications also include those made to third parties— such as the lawyer's secretary, a physician, or similar expert—for the purpose of transmitting such information to the lawyer because they are 'reasonably necessary for the transmission of the information.' … [¶] A lawyer at times may desire to have a client reveal information to an expert consultant in order that the lawyer may adequately advise his client. The inclusion of the words 'or the accomplishment of the purpose for which the lawyer is consulted' assures that these communications, too, are within the scope of the privilege.… [¶] The words 'other than those who are present to further the interest of the client in the consultation' indicate that a communication to a lawyer is nonetheless confidential even though it is made in the presence of another person—such as a spouse, parent, business associate, or joint client—who is present to further the interest of the client in the consultation. These words refer, too, to another person and his attorney who may meet with the client and his attorney in regard to a matter of joint concern." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 172.)

It is this last notion, "joint concern," that is the basis of the common-interest doctrine. Evidence Code sections 912 and 952, however, make no reference to common interests or joint concerns; they refer instead to a reasonable necessity of disclosure. Those two sections give rise to the common-interest doctrine. This is because, in limited situations, the alignment of the parties' common interests may mean disclosures between them are reasonably necessary to accomplish the purposes for which they are consulting counsel.

This, consequently, is the limited manner in which California has adopted a rule preserving privileges when parties with common interests disclose privileged communications to each other. The privilege survives disclosure to a party with a common interest only if it is necessary to accomplish the privilege holder's purpose in seeking legal advice. The doctrine extends no further than this because in California there is no independent statutory joint defense or common interest *privilege*, and

California courts are not authorized to establish one. The "Federal Rules of Evidence provide that principles of common law govern rules of privilege" and, consequently, the Ninth Circuit, for example, "has recognized a 'joint defense privilege' as an 'extension of the attorney-client privilege' since at least 1964. [Citation.]" (*OXY Resources, supra*, 115 Cal.App.4th at p. 888.) We, by contrast, are "not free to create new privileges as a matter of judicial policy and must apply only those which have been created by statute." (*Dickerson v. Superior Court, supra,* 135 Cal.App.3d at p. 99.)

With this background in mind, we turn to whether a lead agency can share with the project applicant a preapproval interest in the creation of a legally defensible EIR that supports the applicant's proposal. It is important to be clear at the outset that the common interest, if there is any, is in the creation of a legally defensible environmental document *that supports the applicant's proposal*. There is no point in asking, as the city and developer in this case would have it, whether the applicant and agency have a common interest simply in the development of a legally defensible environmental document. This is because the developer has *no* interest in the development of an environmental document that does *not* support the developer's proposal.

Before completion of environmental review and project approval, the law presumes the lead agency is neutral and objective and that its interest is in compliance with CEQA. It is this neutral role which could cause it to reject the project or certify an EIR supporting one of the project alternatives or calling for mitigation measures to which the applicant is opposed. The agency's unbiased evaluation of the environmental impacts of the applicant's proposal is the bedrock on which the rest of the CEQA process is based. In *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), for example, our Supreme Court held that a city could not define "approval" of a project in such a way that its actual commitment to the project was already made before environmental review had been completed and the project formally approved. (*Id.* at p. 132.)

27.

In *Save Tara*, the city entered into an agreement to develop property conditioned on subsequent environmental review and CEQA compliance. Before environmental review was completed, the city lent money to the developer for preparatory activities, announced publicly that it was determined to proceed with the project, and began relocating tenants whom the project would displace. (*Save Tara, supra,* 45 Cal.4th at pp. 140-142.) Our Supreme Court held that the city violated CEQA because it was committed to the project before going through environmental review. The defect in the proceedings was that the city's actions tended "strongly to show that City's commitment to the … project was not contingent on review of an EIR." (*Save Tara, supra,* at p. 142.) In other words, CEQA forbids an agency to be committed to accepting an applicant's proposal before environmental review has been completed.

*Save Tara* applied a concept that is common in CEQA cases. This is the concept that a primary purpose and effect of CEQA is to require agencies to confront environmental impacts *before* deciding in favor of applicants' projects. In *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, for instance, we reiterated the point that "'[t]here is a sort of grand design in CEQA: Projects which significantly affect the environment *can* go forward, but only after the elected decision makers have their noses rubbed in those environmental effects, and vote to go forward anyway.'" (*Id.* at p. 720 [quoting *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 530].) This means that the product of the agency's efforts in conducting environmental review must reveal the true impacts of the proposed project, no matter how unattractive. The agency must unblinkingly include all significant impacts in the EIR and consider them with an open mind when deciding on project approval.

28.

In our view, the lead agency's obligation not to commit to the project in advance, but instead to carry out an environmental review process and create environmental documents that reveal the project's impacts without fear or favor, and only then make up its mind about project approval, means the agency cannot have an interest, prior to project approval, in producing a legally defensible EIR or other environmental document that supports the applicant's proposal. At the same time, of course, the applicant's primary interest in the environmental review process is in having the agency produce a *favorable* EIR that will pass legal muster. These interests are fundamentally at odds.

The conflict between the agency's interests and the applicant's is far from being only theoretical. For many issues of the first degree of importance—whether an impact is significant or a mitigation measure is feasible, for instance—there may be substantial evidence on both sides. Either conclusion might survive judicial review. It is on issues like these that the preparers of environmental documents must make their most crucial decisions. On these issues, the interests of the agency and applicant are opposed, even though they share an interest in producing a document that will be legally sufficient. The agency's duty is to present the conclusion best supported by the facts, while the applicant's interest is to present the conclusion most favorable to its proposal. These often will be opposite conclusions, although either would be legally sufficient.

In some cases, the common-interest doctrine may apply to parties who have interests that are partly common and partly opposed. (See *OXY Resources, supra*, 115 Cal.App.4th at p. 888 [concept of joint defense has expanded over the years to encompass, among other things, "'parties who oppose one another in a case but are able to join forces on a particular issue of common interest'"]; *STI Outdoor v. Superior Court* (2001) 91 Cal.App.4th 334, 337-341 [trial court erred in finding waiver by disclosure between public agency and private party negotiating for public contract even though contract was not yet finalized; disclosure of communications was reasonably necessary to

further interests of both parties in finalizing it].)  This, however, is not that kind of case.  The relationship between a lead agency and project applicant is unique.  Before project approval, the agency must *objectively judge* whether the project as proposed is environmentally acceptable and therefore must make a decision about *whether* it will align itself with the applicant in part, in whole, or not at all.  Only after approving the proposal can the agency be said to join forces with the applicant.  There may be, and typically are, extensive communications between them, but they cannot yet be said to be "on the same side."  Before project approval, therefore, the agency does not have even partially common interests with the applicant.  The nature of its interest is held in abeyance until it decides whether to approve the project.

In saying this, we do not mean to imply that the members of an agency's governing board are legally prevented from having a favorable opinion of a project from the outset.  We also do not mean to imply that the agency and applicant should not work together on the EIR.  Agencies and applicants routinely do so and CEQA contemplates that they will.  The point is simply that the lead agency, as an agency, cannot have any commitment to the project as proposed until after environmental review is complete.  This means its interests as it pursues the environmental review process are fundamentally not aligned with those of the applicant, and preapproval disclosure of communications by one to the other waives any privileges the communications may have had.

For similar reasons, the policies behind the attorney-client privilege and the attorney work-product doctrine do not support the suspension of waiver principles when communications are disclosed between agency and applicant before project approval.  The purpose of the attorney-client privilege is to enhance the effectiveness of the adversarial system by encouraging candid communication between lawyers and their clients.  This purpose does not include encouraging strategizing between a private applicant and a government agency to meet a future challenge by members of the public to a decision in favor of the applicant if, at the time of the strategizing, the agency has

30.

not, and legitimately could not, have yet made that decision. The purpose of the attorney work-product doctrine is to allow attorneys to advise and prepare without risk of revealing their strategies to the other side or of giving the other side the benefit of their efforts. Before completion of environmental review, the agency cannot have as a legitimate goal the secret preparation, in collaboration with the applicant, of a legal defense of a project to which it must be still uncommitted.

One case is cited by the the city and the developer that arguably contains a holding contrary to ours. In *California Oak, supra,* 174 Cal.App.4th 1217, a county considering a project subject to CEQA received four documents from its outside counsel, which had been retained to advise it on CEQA compliance. The county disclosed the documents to counsel for the developer. (*California Oak, supra,* at p. 1221.) The county claimed the documents were protected by the attorney-client privilege, and the common-interest doctrine prevented waiver by disclosure to the developer. Challengers moved unsuccessfully for an order compelling the county to include the documents in the administrative record. On appeal, they argued that section 21167.6 superseded the attorney-client privilege, and the common-interest doctrine did not apply. (*California Oak, supra,* at pp. 1220-1221.) The Court of Appeal rejected these arguments. On the common-interest doctrine, the court stated:

> "[The challenger] argues that [the county's] communication to [the developer] was not reasonably necessary for the accomplishment of the purpose for which [the county] took advice from the outside counsel. To wit: '[T]his purpose—to achieve compliance with CEQA—differed from [the developer's] purpose, which was to defend their permits against a CEQA [lawsuit].' [The challenger] takes too crabbed a view of [the county's] purpose in considering the advice of the outside counsel. [¶] The purpose of achieving compliance with the CEQA law, reasonably viewed, entails a further purpose. It includes producing an EIR that will withstand a legal challenge for noncompliance. Thus, disclosing advice to a codefendant *in the subsequent joint endeavor to defend the EIR* in litigation can reasonably be said to constitute '"involvement of third persons to whom

31.

disclosure is reasonably necessary to further the purpose of the [original] legal consultation.""" (*California Oak, supra*, 174 Cal.App.4th at pp. 1222-1223, italics added.)

The italicized phrase above is somewhat ambiguous. It arguably means the disclosure by the agency to the applicant took place *after the project was approved and legal defense of the agency's decision had commenced.* The application of the doctrine to a disclosure taking place at *that* stage is straightforward. After environmental review is complete and the agency has certified the EIR and approved the project, there is no longer any conflict between the agency's role as an ally of the developer and its role as an objective evaluator of the project. Nothing in the published portion of the opinion directly indicates when the disclosure took place.

The city and the developer argue that the court's remarks imply that it intended to refer to all privileged communications between the agency and applicant, not just those taking place after project approval. They say the statement that the agency's purposes include *producing* a legally sufficient EIR mean the court "must have been addressing communications relating to the *production* of a legally compliant EIR, not just defending an already approved EIR." If so, we disagree for the reasons we have stated and decline to follow *California Oak*.

The developer also cites *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738. There, the Court of Appeal held that a project applicant was required to pay half of the attorney's fees awarded to a plaintiff who successfully challenged an EIR, while the agency paid the other half. The court stated that the developer worked with the agency's staff in developing the EIR, and the threat of a fee award would incentivize applicants to try to make sure EIRs are legally adequate. (*Id.* at p. 756.) This case does not show that an agency and applicant have a common interest for purposes of the common-interest doctrine. We agree that an EIR is often the work of both the agency and the applicant, and that the applicant has an interest in making sure the EIR is compliant with CEQA. Yet these facts do not show that the interests of

32.

the agency and applicant in the development of the EIR and completion of the environmental review process are the same. A fundamental tension between the agency's interest in objective environmental analysis and the applicant's interest in obtaining approval of the proposed project prevents those interests from being aligned before the project is approved. Both have an interest in producing a legally adequate EIR, but as we have said, the agency cannot share the applicant's interest in an EIR that *supports the project as proposed* until the environmental review process is complete.

Contrary to city and developer's contentions, our holding is not affected by the proposition that the applicability of the common-interest doctrine does not depend on the commencement of litigation. The attorney-client privilege and the attorney work-product doctrine apply to many situations not yet involving litigation or never involving it. (See, e.g., *Roberts, supra,* 5 Cal.4th at p. 371; *STI Outdoor v. Superior Court, supra,* 91 Cal.App.4th at pp. 340-341.) The crucial point in time for our purposes here is project approval, not the commencement of litigation. That point is crucial for the reasons we have stated. The time of commencement of litigation has no significance.

For all these reasons, we conclude that the city and developer have waived the attorney-client privilege and the protection of the attorney-client work-product doctrine for all communications they disclosed to each other before the city approved the project. Consequently, any such communications that fall within section 21167.6, subdivision (e), must be included in the administrative record.

As we have already indicated, the situation is different a*fter* project approval. Then the agency's and applicant's interests are aligned, assuming the approval has not left any dispute remaining between them. Both are legitimately committed to the same thing at that point—defending the project as approved. Under those circumstances, there is nothing about the agency-applicant relationship that would stand in the way of applying

33.

the common-interest doctrine, assuming its elements are satisfied with respect to the particular communications for which its protection is claimed.

### III.     *Showing necessary to establish the common-interest doctrine*

The availability of the common-interest doctrine for postapproval disclosures is not likely to be of much significance in this case. Only one document listed on the privilege log asserts the common-interest doctrine and is dated after project approval— the very last item, number 3,311, dated September 13, 2011. This one document, however, was included both in the challenger's original list of 2,275 challenged items and in the list of more than 500 challenged documents in the challenger's brief for the July 6 hearing. Further, the city's privilege log was a work in progress and we may not be aware of all the communications that were being withheld. The parties therefore may have a live dispute over postapproval communications for which the common-interest doctrine is claimed. Consequently, we will discuss several points regarding the task of establishing the applicability of the common-interest doctrine, about which we asked the parties for briefing.

The trial court appears to have believed the city was entitled to the protection of the common-interest doctrine for any communications for which it invoked it, so long as it also invoked a privilege. This is not correct. The city can receive the protection of the doctrine only if all the elements of the doctrine are established. The city must first make a showing of preliminary facts establishing that the communications at issue are privileged, as discussed in part IV of this opinion. There also must be a reasonable expectation of confidentiality, and the disclosure to the third party must be reasonably necessary to the advancement of the common interest about which the parties were obtaining legal advice. (*OXY Resources, supra*, 115 Cal.App.4th at p. 891.)

We turn to the question of in camera review for common-interest-doctrine claims. As we will explain, our Supreme Court's decision in *Costco*, *supra*, 47 Cal.4th 725, leads to the inexorable conclusion that the trial court is not permitted to review a document in

34.

camera to determine whether an asserted privilege has been waived by disclosure or has instead been preserved by the common-interest doctrine.

In *OXY Resources*, the Court of Appeal held that when the trial court finds the common-interest doctrine applies it may review the disputed documents in camera. The court's view was that this could be necessary because there is generally no other way for a trial court to know whether a disclosure was reasonably necessary to accomplish the purpose for which a lawyer was consulted. (*OXY Resources, supra,* 115 Cal.App.4th at p. 894.) The court held that the general rule prohibiting in camera review of alleged privileged documents does not apply when deciding whether the elements of the common-interest doctrine have been met. This is because the common-interest doctrine provides a qualified protection, not an absolute protection. (*Id.* at p. 896.)

*Costco*, however, rejected this reasoning. Citing Evidence Code section 915, subdivision (a), the court stated, as a generally applicable rule, that, even for purposes of in camera review, "a court may not order disclosure of a communication claimed to be privileged to allow a ruling on the claim of privilege .…" (*Costco, supra,* 47 Cal.4th at p. 739.) At the same time, citing Evidence Code section 915, subdivision (b), the court held that "a court may order disclosure of information in order to determine whether it is protected by the work product doctrine" under Code of Civil Procedure section 2018.030, subdivision (b). (*Costco, supra,* at p. 737, fn. 4.) In camera review of a document is *not* allowed for purposes of ruling on a claim that it is subject to the unqualified protection of Code of Civil Procedure section 2018.030, subdivision (a). (Evid. Code, § 915, subd. (a).) Addressing *OXY Resources* specifically, the court stated:

> "Plaintiffs also cite *OXY Resources* … where the appellate court
> observed that notwithstanding Evidence Code section 915, subdivision (a),
> courts have allowed in camera review of information claimed to be
> privileged where necessary to determine whether an exception to the

privilege applies.  As we have explained, section 915 prohibits disclosure of information claimed to be privileged in order to determine if a communication is privileged." (*Costco, supra*, 47 Cal.4th at p. 740.)

The court did not expressly state that it was overruling *OXY Resources* on this point, but it does not seem that the *OXY Resources* court's approach is compatible with our Supreme Court's holding.  In light of *Costco*, we conclude that the trial court can order in camera review of documents only if the attorney-client privilege or the unqualified attorney work-product protection is not claimed or has been found by the trial court to be inapplicable.  In camera review of documents for which only the qualified attorney work-product protection is claimed may be permissible under Evidence Code section 915, subdivision (b).

Since in camera review will generally not be available, how is the trial court to determine whether the elements necessary to apply the common-interest doctrine are present?  In claiming the protection of the common-interest doctrine, the city and developer admit that their communications have been disclosed to third parties (i.e., each other), which means privileges are waived unless the doctrine applies.  Since in camera review is not allowed, the only way for the trial court to find out whether the elements of the doctrine are satisfied is to allocate the burden of establishing them to the privilege claimant.  Only that party can say whether disclosure to the third party was necessary to the advancement of the privilege claimant's interest in obtaining legal advice.  For each

document claimed to be protected, therefore, the city must present evidence of these facts.  A declaration of the necessary facts by a person with personal knowledge of the communication could suffice.[3]  We are aware of the general rule that a party claiming

---

[3]We do not mean to imply that the declaration must disclose the contents of the communication.  For instance, the declarant could declare, under penalty of perjury, that he or she has personal knowledge that the city disclosed document "XYZ" on the privilege log to the developer with an expectation that the developer would preserve the

waiver has the burden of showing it (*Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 124), but that rule cannot be interpreted to mean a party challenging an assertion of the common-interest doctrine has the burden of producing facts the other side exclusively controls.  A challenger asserting waiver has the burden of showing *disclosure to a third party*, but that disclosure is undisputed when the common-interest doctrine is relied upon.  Our view is that after third-party disclosure has been conceded via the assertion of the common-interest doctrine, the burden shifts back to the privilege claimant to produce evidence that the elements of the doctrine exist.

In its return, the developer relies on the following to support its contention that the record contains substantial evidence supporting findings that the common-interest doctrine applied to every document for which the city claimed it:  (1) the fact that the city and developer were an agency and an applicant both working on the same project; (2) a declaration by one of the developer's attorneys saying it was generally necessary for her to make disclosures to the city and that she expected confidentiality to be maintained, but referencing only four particular documents and not asserting that the disclosure of any of those particular documents was reasonably necessary; and (3) the developer provided the court with four unredacted documents for in camera review.  This is not sufficient.  The city must provide evidence supporting each element of the common-interest doctrine for *each document* for which the protection of the doctrine is claimed.  Facts about the relationship between the parties cannot establish a blanket guarantee against waiver by disclosure for all their communications.  The common-interest doctrine, as we have mentioned, is not an expanded privilege in which all the clients are treated as clients of all

communication's confidentiality, that the city and the developer had a common interest in obtaining legal advice on the matter communicated, and that the city had a reasonable need to disclose the communication to the developer in order to advance the purpose for which the city sought its attorney's advice.  This would be in addition to the declaration by which the city established the preliminary facts necessary to show that the document was privileged in the first place.

the attorneys.  For this reason, in our view, the showing required for application of the common-interest doctrine differs from the showing required to establish the attorney-client privilege.  As will be seen, the attorney-client privilege can be established for a set of communications by means of a showing that the parties to the communications were an attorney and client in a *relationship* of which the dominant purpose was legal representation or advice.  This showing covers all the communications between them.  There is no reason, however, to presume that every communication between parties and their attorneys who have a common interest is a communication that satisfies the elements of the common-interest doctrine.

## IV.    *Trial court applied wrong standard in upholding privilege claims*

The privilege log contains hundreds of entries in which the attorney-client privilege or the attorney work-product doctrine is claimed, but there is no reference to the common-interest doctrine.  Our discussion of that doctrine therefore does not affect these privilege claims.  The court's ruling upholding all these claims, however, was erroneous for a different reason:  The court failed to require the city to establish the preliminary facts on which the privileges were based, instead assuming that it was sufficient for counsel merely to assert the claims.

As explained above, the claimant of a privilege has the burden of establishing the preliminary facts necessary for the exercise of the privilege.  For the attorney-client privilege, the preliminary facts are that there was an attorney-client relationship and that the specific communication at issue was made in the course of that relationship.  For the attorney work-product doctrine, the preliminary facts are either that the document "reflects an attorney's impressions, conclusions, opinions, or legal research or theories" (Code Civ. Proc., § 2018.030, subd. (a)) or that it is "[t]he work product of an attorney, other than a writing described in subdivision (a)" of Code of Civil Procedure

38.

section 2018.030. (Code Civ. Proc., § 2018.030, subd. (b).) The privilege claimant usually establishes these facts through declarations.

Our Supreme Court's opinion in *Costco* sheds light on how a privilege claimant can establish the necessary preliminary facts for the attorney-client privilege. *Costco* discussed *2,022 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, in which the Court of Appeal had ordered the trial court to examine, individually and in camera, the documents in a collection of documents transmitted between a title insurance company and its claims adjusters, who were licensed attorneys. The Court of Appeal directed the trial court to distinguish those documents that contained legal advice and were privileged from those that reported the results of factual investigations and were not. Our Supreme Court held that this was error. In camera review was not appropriate to determine the applicability of the privilege, as we have already mentioned. (*Costco, supra*, 47 Cal.4th at pp. 739-740.) The court further stated:

> "The proper procedure would have been for the trial court first to determine the dominant purpose *of the relationship* between the insurance company and its in-house attorneys, i.e., was it one of attorney-client or one of claims adjuster-insurance corporation .… If the trial court determined the communications were made during the course of an attorney-client relationship, the communications, including any reports of factual material, would be privileged, even though the factual material might be discoverable by some other means. If the trial court instead concluded that the dominant purpose of the relationship was not that of attorney and client, the communications would not be subject to the attorney-client privilege and therefore would be generally discoverable." (*Costco, supra*, 47 Cal.4th at pp. 739-740.)

The *Costco* opinion does not say that the dominant-purpose-of-the-relationship test applies also to the attorney work-product doctrine, and we see no reason why it would. Unlike the attorney-client privilege, of which "the fundamental purpose … is the preservation of the confidential relationship between attorney and client" (*Costco, supra,* 47 Cal.4th at pp. 740-741), the work-product doctrine is designed to protect the secrecy of

39.

individual items of work product.  The rule is still good, therefore, that the applicability of the work-product doctrine "should be made on an item-by-item basis" (*BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1261), not on the basis of the dominant purpose of the attorney's and client's relationship, even though in camera review is potentially available only for the qualified work-product doctrine.[4]

In this case, the record indicates that the city did not submit substantial evidence that could establish either the attorney-client privilege or the work-product privilege for any document.[5]  One declarant stated that his law firm represented the city in all matters related to the project.  A second declarant stated that she and two other attorneys in her firm represented Wal-Mart in connection with the preparation of the EIR.  A third declarant stated that he also represented Wal-Mart.  These declarations are sufficient to show that an attorney-client relationship existed between one attorney and the city, and four other attorneys and the developer.  That is not, however, enough information to establish the preliminary facts.  The privilege log names dozens of individuals and lists thousands of documents.  The declarations do not identify any of the individuals as clients or say whose clients they are.  The declarations do not say that any of those individuals are agents of attorneys.  The privilege log includes many entries in which none of the five attorneys who signed or were mentioned in the declarations appear as either sender or recipient.  Except for four of the developer's documents that were disclosed to the city

[4]One method of establishing the necessary facts without in camera review is to submit a declaration in which the declarant states that he or she has personal knowledge that certain items (specified by number) listed in the privilege log are attorney work product as defined in Code of Civil Procedure section 2018.030, subdivision (a), or section 2018.030, subdivision (b).

[5]The declaration of the developer's attorney Miriam Montesinos states that, to her personal knowledge, four documents are attorney work product.  The four documents, however, were disclosed by the developer to the city before project approval, so the work-product privilege was waived for them.

(thereby waiving privileges), the declarations do not say that any individual document was the work product of an attorney or was made in the course of an attorney-client relationship. The declarations therefore are not sufficient to establish the preliminary facts for the asserted privileges, either under the dominant-purpose-of-the-relationship test or on an item-by-item basis. The privilege log itself, of course, without adequate supporting declarations, establishes nothing. It is merely a list, amounting at most to an implied conclusory hearsay declaration by an unnamed compiler that the listed communications are privileged.

The requirement to produce evidence of preliminary facts is no empty formality. Since the court cannot review the documents to ascertain their privileged status, this requirement is the only safeguard for the opposing party. This case illustrates the need for evidence of preliminary facts. The city first withheld thousands of documents in silence, then acknowledged it had withheld them but would not provide any information about them, and finally provided a log asserting that they were all privileged without providing the supporting facts. In its letter to the court of May 24, 2012, the city explained that, after the challenger challenged 2,275 privilege claims, the city *then* undertook a "review of the privilege log" and had to make "necessary changes." These changes were still not complete on May 24, and the city wrote that it would "submit the amended privilege logs" when it was "sure that no further changes will need to be made." The rule that a privilege claimant must establish preliminary facts prompts the claimant to make a clear determination of which documents are privileged *before* asserting privileges.

For these reasons, it will be necessary for the trial court to vacate its order upholding the city's privilege claims. The city will be permitted to amend its submissions to conform to the requirement that preliminary facts be shown, and the court will be required to review the city's showing and make the necessary findings for the privilege claims it decides to uphold.

41.

The trial court commented on the number of the privilege claims that were being challenged, and the city and developer contend that the challenger's decision to contest claims undermines the purposes of the law. There is no rule, however, that a party otherwise entitled to documents must, when confronted with privilege claims, relinquish that entitlement whenever the privilege claims are numerous. The party seeking the documents is entitled to a ruling on every privilege claim it chooses to contest. If necessary, the court can appoint a referee to examine the claims.

We asked the parties to brief whether any special showing is necessary to establish preliminary facts when the claim of privilege is for a document of which an attorney was neither the sender nor the primary recipient, but was the recipient of a "cc." The answer is that, while no special *showing* is necessary, the city must keep certain legal principles in mind when compiling its evidence of preliminary facts. The controlling principles are set out in *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1504: "It is established that otherwise routine, nonprivileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda.… In addition, 'It is settled that the attorney-client privilege is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent.'" A document sent from one employee or agent of the city to another, with an attorney receiving a "cc," may or may not be a communication in the course of an attorney-client relationship. If the purpose of "copying" the attorney was not to submit the matter being communicated to the attorney for the attorney's legal opinion or advice but was some other purpose, then the communication was not in the course of the attorney-client relationship. In preparing its declarations, the city must take care not to assert that preliminary facts establishing a privilege exist for communications that were not truly made as part of an attorney-client

relationship. This is particularly important in this case, in which the city's counsel told the challenger in writing that attorneys were always used for communication for the express purpose of maintaining secrecy.[6]

The developer argues on this point as follows:

"[The challenger] presents evidence showing, that 'the City and the project applicant retained legal counsel to assist with, and oversee compliance with CEQA and all other relevant laws and regulations.' Writ Petition, at p. 27, ¶ 2. The City and Walmart separately hired attorneys to provide advice regarding CEQA compliance. Irrespective of whether the client listed the attorney as a 'to' or 'cc' recipient, the client communicated information to the attorney. These facts, alone, are sufficient to demonstrate a communication in the course of the lawyer-client relationship."

This is not correct. That a client "communicated information" to an attorney does not show that the communication took place in the course of the attorney-client relationship. Ordinary business information communicated in an attempt to take advantage of the privilege would not be privileged.

Finally, we reject the city and developer's contention that the city was never required to submit a privilege log. They say the city was not required to do so because CEQA does not say anything about privilege logs. The challenger, however, is entitled to

all materials that fall within section 21167.6, subdivision (e), unless privileged. Interposing a claim of privilege is a way of resisting production of otherwise required information. If challenged, a privilege claim must be litigated, and a privilege log is a

_____

[6]We speak here only of the attorney-client privilege, not the work-product doctrine. There can be no protection under the attorney work-product doctrine for a communication that is not made by—and does not include any writing made by—an attorney or his or her agent. If an attorney is not the maker of a document, but merely receives a "cc" of it—and it was not made by his or her agent, or by another attorney or his or her agent—then the document is not protected by the attorney work-product doctrine.

tool to allow the court to rule. If the city did not use something called a "privilege log," it would have to use its practical equivalent in the process of carrying its burden to establish preliminary facts. The law, which we have described above, is straightforward: If a party wants the benefit of a privilege, it must take certain steps to establish the privilege. There is nothing about CEQA that changes this point.

## V. *City and developer's additional arguments against writ relief*

### A. *City and developer's claim that all the contested documents should be excluded from the administrative record because they were not submitted to the city council or released to the public*

As an independent reason for upholding the trial court's order, the city argues that none of the documents it has withheld or sought to exclude from the administrative record should be included because they were not submitted to the city council and were not released to the public. The challengers disagree.

The dispute on this point stems from the parties' disagreement over the meaning of an exception in section 21167.6, subdivision (e)(10), for draft environmental documents that have not been released to the public. Section 21167.6, subdivision (e), provides that the administrative record shall include all the matters listed, including the following in subdivision (e)(10):

> "Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division."

The challengers argue that this language establishes narrow exceptions or exclusions from the administrative record for drafts of "environmental documents," i.e., EIRs, negative

declarations, and mitigated negative declarations, that have not been released for public review, and for studies or documents relied upon in environmental documents that have not been released to the public or included in the agency's files.

The city and developer argue for a far broader interpretation of these provisions. Quoting the trial court's remarks at the July 9 hearing, the city argues that "'[t]he record is what … goes in front of the Board to make their determination.  That's what it is.… [¶] … [¶] … I don't really care about all this other stuff they did behind the scenes.  I'm only going to look at the record.'"  The city and developer also quote a well-known CEQA treatise:

> "Administrative drafts of EIRs, EIR working papers, draft staff reports, and similar preliminary documents that preceded the documents circulated for public review or submitted to the decision-making body are not treated as part of the record of proceedings, because they are not evidence that the agency considered."  (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2012) § 23.73, p. 1216.1.)

This passage, however, goes on to say:  "Internal staff communications relevant to the agency's compliance with CEQA or its decision on the merits of the project are also part of the record under Pub Res C § 21167.6(e)(10)."  This treatise, therefore, is less supportive of the city and developer's position than their quotation indicates.

The city cites similar remarks in another well-known CEQA treatise.  (Remy et al., Guide to CEQA (11th ed. 2006) pp. 861-865.)  The term "administrative draft," which does not appear in the statute, seems to be taken from these two treatises.  The second treatise contains an extensive discussion acknowledging that several provisions of section 21167.6, subdivision (e), are directly in conflict with the view that the administrative record includes only materials submitted to the governing body or released to the public, but urging that those provisions should not be interpreted literally.  As grounds for rejecting the plain meaning of those provisions of subdivision (e), that treatise advances a number of arguments based on policy and purported conflicts with

45.

other laws. (Remy, *supra*, at pp. 861-865.) The city summarizes its view by saying "[o]nly the finished product matters."

We asked for briefing on documents described as "administrative drafts" in the privilege log. The parties' submissions, however, have made it clear that the issues relevant to those documents are the same as those underlying the city and developer's view that all the documents relate to a phase of environmental review that is exempt from inclusion in the administrative record. Having reviewed the briefing, we conclude that this issue should be considered by the trial court in the first instance if necessary, and we will express no opinion on it.

## B.    *Prejudice*

The city argues that we should uphold the trial court's order because the challenger has not shown prejudice. The city maintains that, to show prejudice, the challenger would have to make a showing of the relevance of the documents that have been withheld and excluded. We disagree.

The city argued to the trial court that the challenger "has made no argument why any of these documents are relevant to the claims and defenses in this case." The trial court appeared to agree with this approach. During a discussion about five particular documents, the court asked counsel for the challenger whether he agreed to "reserve your issue as to the relevancy in 210[**7**] of the Evidence Code?" Counsel answered, "I guess my concern would be when we look at the CEQA statute, it does not talk about relevance

---

**7**"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

46.

under 210 of the Evidence Code." The court said: "That's because it doesn't talk about it, but the only admissible evidence in court is relevant evidence, and the only relevant evidence is admissible under 351[8] of the Evidence Code." In its return filed in this court, the city says the challenger was not harmed by the trial court's ruling because the documents excluded "have *no relevance* to the Trial Court's review of whether the publically available documents demonstrate the City's compliance with CEQA."

For purposes of deciding a motion to augment the administrative record—the only purposes at issue here—we do not believe a relevance analysis under the Evidence Code is appropriate. The analysis under section 21167.6 determines the content of the administrative record, and that analysis stands on its own. As we pointed out in *Madera Oversight, supra*, 199 Cal.App.4th at page 63, the language of section 21167.6, subdivision (e), "is mandatory—*all* items described in any of the enumerated categories *shall* be included in the administrative record." We also explained that the first step in determining what counts as evidence in a CEQA case is to decide which documents are covered by subdivision (e); *only afterward* is a further analysis appropriate to determine whether *additional* evidence—referred to as extra-record evidence—should be deemed admissible. (*Madera Oversight, supra,* at p. 62 ["As a general proposition, the proper method of analysis for determining whether a particular item should be considered as evidence in a CEQA matter is to determine first whether the item is part of the administrative record pursuant to subdivision (e) of section 21167.6. If the item does not qualify for inclusion in the administrative record, then its admissibility can be determined under the rules applicable to extra-record evidence"].) To exclude evidence from the administrative record on the ground that it was within subdivision (e) but irrelevant under

---

[8]"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)

47.

the Evidence Code would be error. Consequently, we reject the city's contention that the challenger must show prejudice by demonstrating that documents withheld or excluded are relevant apart from their status as materials encompassed by subdivision (e).

We do not mean to imply that the omission of a document required to be included in the administrative record can never be deemed harmless error on appeal. It can, and we held that such an omission was harmless in *Madera Oversight, supra*, 199 Cal.App.4th at page 75. Here, the case has not yet reached any outcome, however, so we cannot say whether a different ruling by the trial court would have led to a better outcome for the challenger. The point is simply that, at this stage, the question the city raises is whether an erroneous decision on the contents of the administrative record can be excused on the ground that the challenger did not show the omitted material to be relevant under the Evidence Code. The answer is no.

In an allied argument, the city told the trial court that none of the documents it had withheld belonged in the administrative record because the administrative record exists "to document the substantial evidence in support of the City's decision following an administrative process." The city apparently reasons that, because its factual findings in the EIR must be upheld if supported by substantial evidence, unfavorable evidence that might be found in the withheld documents would have no potential impact on the trial court's decision. This is not correct, however. Suppose, for example, that an EIR contains the finding that no feasible mitigation measures are available for a significant environmental impact. The finding is based on a discussion in the EIR of several potential mitigation measures, all of which would be prohibitively costly. An additional possible mitigation measure, far less costly yet likely to be effective, has been omitted from the EIR, but is discussed in an agency staff report. This piece of evidence would be relevant to the trial court's consideration of whether substantial evidence supported the finding that no feasible mitigation measures were available.

48.

For reasons like this, there is no general rule that a court carrying out a substantial-evidence review considers only the evidence supporting the decision being reviewed. Instead, the court reviews the entire record. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) The Court of Appeal has summarized the point:

> "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. (*Kuhn v. Department of General Services* [(1994) 22 Cal.App.4th 1627, 1633.] 'A formulation of the substantial evidence rule which stresses the importance of isolated evidence supporting the judgment, ... risks misleading the court into abdicating its duty to appraise the whole record. As Chief Justice Traynor explained, the "seemingly sensible" substantial evidence rule may be distorted in this fashion, to take "some strange twists." "Occasionally" he observes, "an appellate court affirms the trier of fact on isolated evidence torn from the context of the whole record. Such a court leaps from an acceptable premise, that a trier of fact could reasonably [have believed] the isolated evidence, to the dubious conclusion that the trier of fact reasonably rejected everything that controverted the isolated evidence. Had the appellate court examined the whole record, it might have found that a reasonable trier of fact could not have made the finding in issue. One of the very purposes of review is to uncover just such irrational findings and thus preclude the risk of affirming a finding that should be disaffirmed as a matter of law." (Traynor, The Riddle of Harmless Error (1969) p. 27.) (Fns. omitted.)' (*People v. Johnson* [*, supra,* 26 Cal.3d at pp. 577-578].)" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

A separate question suggested by the city's arguments about prejudice is whether a piece of evidence is irrelevant in showing a lack of substantial evidence because it was not placed before the decisionmaking body. This question is related to, but distinct from, the question of whether documents should be excluded from the administrative record because they were not before the decisionmaking body, which we discussed in part V.A above. In *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 (*Western States Petroleum*), our Supreme Court stated in a footnote that "the only

evidence that is relevant to the question of whether there was substantial evidence to support a quasi-legislative administrative decision under Public Resources Code

section 21168.5 is that which was before the agency at the time it made its decision." (*Id.* at p. 573, fn. 4.)

*Western States Petroleum* was decided in February 1995 and presumably dealt with agency action that took place before current section 21167.6, subdivision (e), was added to CEQA in September 1994. (Stats. 1994, ch. 1230, § 11.) Subdivision (e), as we have said, has provisions in conflict with the idea that materials should be excluded from the administrative record if they were not submitted to the decisionmaking body. It is not clear how the Supreme Court's statement just quoted interacts with the provisions of subdivision (e) that appear to mandate the inclusion in the administrative record of material that generally would not be presented to the decisionmaking body (e.g., "staff notes and memoranda" [§ 21167.6, subd. (e)(10)]). The question presented in *Western States Petroleum* was whether extra-record evidence was generally admissible in a CEQA case, not what the content of the administrative record would be in the first place. (*Western States Petroleum, supra,* 9 Cal.4th at pp. 564-565.) Whether an item is part of the administrative record is one question. Whether it is relevant to a particular litigated issue (e.g., whether a certain finding is supported by substantial evidence) is another. The two questions are controlled by different considerations.

In *Madera Oversight, supra*, 199 Cal.App.4th 48, 66, 72, the trial court ruled that a written decision of the superior court in another case involving the same agency, and indicating that the agency had knowledge of certain matters relating to the project proponent's water rights, was "written materials relevant to the respondent public agency's compliance with [CEQA]" (§ 21167.6, subd. (e)(10)), and therefore was part of the administrative record. The agency argued that the document was irrelevant and should not be part of the administrative record because it was not before the agency's

50.

governing board when it approved the project. We rejected the agency's argument because the agency "pointed out no potential errors of fact or law made by the court in reaching the determination that the [document] was part of the administrative record pursuant to subdivision (e)(10) of section 21167.6." (*Madera Oversight, supra*, at p. 73.)

In part V.A above, we stated that we are not deciding whether documents should be excluded from the administrative record because they have not been placed before the decisionmaking body. For similar reasons, we also will not decide in these writ proceedings what bearing the fact that a piece of evidence has or has not been presented to the decisionmaking body may have on its relevance to the substantive issues that are litigated in the trial court. The question has not been litigated in the trial court and is not fully addressed in the briefs filed in this court.

### C. *Forfeiture*

The city and the developer both stress the argument that the challenger should be barred from maintaining the bulk of its challenges to the privilege claims because it failed to present most of them in a proper manner in the trial court, therefore forfeiting them. The record does not support this contention.

Generally speaking, a reviewing court will not consider a claim that has not been presented in some appropriate manner in the trial court. It is usually unfair to the trial court and the adverse party to take advantage of an error which could have been corrected in the trial court, but was not brought to the court's attention. Consequently, claims not raised before the trial court are forfeited. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.) This principle applies to writ review as well as to appeals. (*Phelan v. Superior Court* (1950) 35 Cal.2d 363, 372 ["Before seeking mandate in an appellate court to compel action by a trial court, a party should first request the lower court to act. If such request has not been

51.

made the writ ordinarily will not issue unless it appears that the demand would have been futile"].) In this case, the challenger expressly placed challenges to hundreds of the city's privilege claims before the trial court at the July 9 hearing, both in writing and orally, and the trial court ruled on them at that hearing. As a result, there was no forfeiture.

The developer contends that, at the April 20 hearing, the court ordered the challenger to challenge a definite, limited set of privilege claims by May 14 or May 21, but no transcript of that hearing is in the record, and the court did not refer to this order at the May 25 or July 9 hearings. The developer says that, in a May 21 letter, the challenger stated that 16 particular documents the city had decided to produce should be included in the administrative record, and that the challenger failed to identify any additional documents as being improperly withheld. This letter, however, also is not in the record, and it is apparent from all the parties' remarks at the May 25 hearing that no drastic reduction in the scope of the dispute had by then taken place. The transcript of that hearing only confirms there were four *categories* of documents at issue, and that the parties *hoped* the number of documents would be reduced. The developer argues that the challenger's own letters indicated that they intended to challenge only a handful of documents, but this is not the case. In the challenger's May 25 letter to the court, the challenger stated that the city's responses to its 2,275 challenges were provided at the last minute and the challenger was reserving its rights on those claims. The city relies on the challenger's June 14 letter, but, as we have said, that letter discusses documents the city had already produced and a batch of recently added privilege claims. It concedes nothing about any documents being withheld. The city implies that the trial court itself found that no large number of challenges to the privilege claims had been properly presented to it and that it refused to rule on most of the challenges for that reason. We disagree with this characterization. The court expressed surprise and displeasure about the number of privilege claims still at issue, but it never said they had been improperly presented, never

52.

refused to rule on them, and never assigned blame to one side or the other for the large number of outstanding disputed claims. When the challenger said at the July 9 hearing that it had reserved its objections to all the privilege claims, the court did not disagree.[9] We read the court's ruling as rejecting the challenges and upholding the privilege claims on their merits.

All the city and developer can really point to is their own and the court's statements of surprise at the July 9 hearing that a great many of the city's privilege claims were still being challenged. It is clear, however, that a large number of documents remained in dispute at the time of the May 25 hearing, and there is no evidence in the record of any agreement to a drastic reduction during the month between that hearing and the submission of the simultaneous briefs on June 26.

For all these reasons, there is no basis for the contention that the challenger failed to preserve most of its challenges to the city's privilege claims by not presenting them in the trial court. The facts are that the challenger challenged 2,275 of the privilege claims, it listed more than 500 disputed documents in its brief for the July 9 hearing, and the court did not refuse to rule on any of those challenges or find that the challenger could not make them because of some procedural default. There were no grounds on which the court could have refused to rule on the merits. Instead, the court recognized all of the challengers' challenges and rejected them on the merits.

_____

[9]The court said 700 documents were too many and asked counsel for the challenger to describe an example of a disputed document. Counsel remarked that "we did reserve our objections on this as we were going through the process." The court replied, "You can reserve anything you want. You're in front of me right now. So give me an example." The trial court's comments here are not consistent with a determination that the challenger had failed to present the issue properly and therefore the trial court would refuse to address it.

### D.     Exhaustion of administrative remedies

The city and the developer argue that the challenger cannot have exhausted its administrative remedies with respect to any topic dealt with in the documents respondents withheld because petitioner has no knowledge of the documents and therefore cannot have raised their contents in the administrative proceedings.  This contention is based on a misunderstanding of the doctrine of exhaustion of administrative remedies as applied to CEQA cases.

The exhaustion requirement states that an issue cannot be litigated in court unless someone has brought it to the agency's attention during the administrative proceedings. Before a petitioner can assert a CEQA violation against an agency in court, someone— not necessarily the petitioner—must raise the same issue before the agency in the administrative proceedings.  (§ 21177, subd. (a).)  The petitioner itself need only have raised *some* objection before the agency (§ 21177, subd. (b)); if it has, it may then litigate any issue raised before the agency by anyone.  Further, "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding," since citizens are not expected to bring legal expertise to the administrative proceeding.  (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163.)  The purpose of the exhaustion doctrine is to give the agency an opportunity to respond to objections before those objections are subjected to judicial review.  (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1449.)

The fact that no one brought a *document* to the agency's attention does not mean that no one brought the *issue* to which the document is relevant to the agency's attention. If petitioner or other members of the public raised an issue about traffic on the streets surrounding the project site, for example, then that issue may be raised in the litigation

and documents relevant to the issue may be important in the litigation, regardless of whether or not the agency has previously disclosed them. The city and developer's argument has no merit.

### *E.    No written order issued*

Rule 3(b) requires "a copy of the order or judgment from which relief is sought" to be attached to the writ petition. The city and developer assert that no written order denying petitioner's motion to augment has yet been filed. The city says this means the petition is "in violation of" local rule 3(b). The developer says the petition is "premature" because of this.

These arguments are not persuasive. First, rule 3(b) does not refer to a *written* order. Petitioner included with the petition a copy of the transcript of the hearing at which the court ruled on the motion. The court's oral ruling sustaining the privilege claims is not stated in tentative terms. Second, after ruling, the court set a trial date and a briefing schedule for the trial, with petitioner's opening brief due about six weeks in the future, on August 24, 2012. This obviously was done under the assumption that the administrative record would not be augmented with any of the purportedly privileged material. It is not a purpose of rule 3(b) to enable courts to insulate their pretrial rulings from writ review by failing to reduce them to writing before proceeding to trial.

### *DISPOSITION*

Let a writ of mandate issue directing the superior court to do all of the following:

(1)    vacate its order sustaining the city and developer's privilege claims;

(2)    permit the city to amend its submissions to make the necessary showing of preliminary facts to support its privilege claims;

(3)    based on the city's amended submissions, reconsider all privilege claims contested by the challenger, sustaining only those that are adequately supported under the standards expressed in this opinion; and,

55.

(4)    overrule all privilege claims for communications disclosed between the city and developer before September 12, 2011.

Costs are awarded to Citizens for Ceres.

This court's order staying the proceedings in the superior court is vacated.


_____
                                                           Wiseman, Acting P.J.

WE CONCUR:


_____
Cornell, J.


_____
Franson, J.